UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF FLORIDA

CASE NO. 00-00893-CIV-GRAHAM/TURNOFF

CRC PRESS, LLC,

     Plaintiff,

vs.

WOLFRAM RESEARCH, INC., STEPHEN
WOLFRAM and ERIC WEISSTEIN,

     Defendants.

_____ _____/



## DEFENDANTS' OPPOSITION TO MOTION
## FOR PRELIMINARY INJUNCTION

### I. INTRODUCTION

In 1995, Eric Weisstein established an Internet web site entitled "Eric's Treasure Troves of Science." The site featured, among other things, an encyclopedia of mathematics. It was an immediate success. Today, Dr. Weisstein's math encyclopedia, since renamed "Eric Weisstein's World of Math ("*Treasure Troves/MathWorld*"), continues to be one of the most popular and widely-respected math encyclopedias on the Internet.

The following timeline gives an overview of the important dates in the history of the *Treasure Troves/MathWorld* web site, as well as the dealings between Dr. Weisstein and CRC:

- 1985 – Dr. Weisstein begins compiling entries for what would become Internet encyclopedias of math, physics, music, astronomy and other subjects.

- 1995 – Dr. Weisstein's *Treasure Troves/MathWorld* debuted on the Internet under the name "Eric's Treasure Troves of Math."

- 1997 – Dr. Weisstein signs Author Agreement with CRC for publication of book adaptation of *Treasure Troves/MathWorld*.

- 1998 – CRC publishes a book adaptation of *Treasure Troves/MathWorld*, entitled "*Concise Encyclopedia of Mathematics*" ("*Concise Encyclopedia*").

- 1998 – CRC asks Dr. Weisstein to sign a new contract covering a CD-ROM adaptation of the *Concise Encyclopedia*; the agreement is signed December 18, 1998.
- 6/1999 – Dr. Weisstein accepts a position with Wolfram Research, Inc.
- 11/1999 –*Treasure Troves/MathWorld* becomes available from a WRI-owned server computer and is renamed "*Eric Weisstein's World of Mathematics.*"
- 2/2000 – CRC telephones WRI and claims site now infringes its copyright in the *Concise Encyclopedia*; WRI asks for clarification, but CRC never responds.
- 3/2000 – CRC files the instant action.

From its debut in 1995 through the present, *Treasure Troves/MathWorld* has been continuously available to the public via the Internet, free of charge.

In its complaint and motion for summary judgment, CRC asks this Court to do something that no court has ever done before. Based upon the copyright that CRC owns in the *Concise Encyclopedia*, a book-form adaptation of the *Treasure Troves/MathWorld* site as it existed over two years ago, CRC asks the Court to require Dr. Weisstein to take down the *Treasure Troves/MathWorld* site pending a trial on the merits. We show below that the Court should deny CRC's extraordinary request because CRC has not, and cannot, prove the elements a movant must prove before a Court may grant a preliminary injunction.

## II.  SUMMARY OF THE FACTS

The facts referenced below are set forth in detail in the affidavits of Dr. Eric Weisstein and Theodore Gray attached as Exhibits A and B. The Court will note that the affidavits of Messrs. Weisstein and Gray are considerably longer and more detailed than those submitted by CRC. That is because CRC's submissions fail to address many facts which are unfavorable to CRC's arguments. The Court will also note that the defendants' submissions are in compliance with F.R.E. 408, which prohibits references to statements or offers made during settlement discussions between parties. The same cannot be said of CRC's submissions.

**Creation of Dr. Weisstein's Internet Encyclopedia**

Creating *Treasure Troves/MathWorld* has been Dr. Weisstein's life's work – truly a genuine labor of love. Weisstein ¶ 5 –12; 80. For more than a decade, this project has consumed (and continues to consume) thousands of hours of Dr. Weisstein's time. Weisstein ¶ 5 –12; 80.

Dr. Weisstein's math encyclopedia began as notes and homework assignments he prepared as a high school student in the mid-1980s. Weisstein ¶ 5. He continuously added

materials to his collection during his years of undergraduate and graduate study, and while working as a visiting scientist at NASA's Goddard Space Flight Center. Weisstein ¶ 6 – 8. By the end of the summer of 1990, the math encyclopedia had reached about 100 word–processed pages and hundreds of pages of handwritten notes. Weisstein ¶ 8.

In the early 1990s, the Internet experienced explosive growth in terms of both content and number of users. Weisstein ¶ 9 – 10. Dr. Weisstein saw the Internet as the vehicle which would allow his unpublished encyclopedia to reach the broadest audience, including not only academics, students, scientists, and teachers, but everyday people. Weisstein ¶ 10.

Thus, in the fall of 1990, when he began his graduate program at the California Institute of Technology ("Caltech"), Dr. Weisstein began converting his materials into an electronic format which could then be turned into Internet web pages. Weisstein ¶ 9. Translating the unpublished encyclopedia took years. Weisstein ¶ 9–10. At the same time, Dr. Weisstein continued to update his encyclopedia and add new entries. Weisstein ¶ 10.

In 1995, Dr. Weisstein finally was able to complete the conversion of his materials into an Internet encyclopedia. Weisstein ¶ 10. There was nothing comparable to Dr. Weisstein's collection available for students of mathematics prior to the debut of the site, *Treasure Troves/MathWorld* found an immediate and enthusiastic audience of people from around the world and was quickly included in a variety of subject matter search engines, such as *Yahoo!*[1] Weisstein ¶ 9-11. Today, it is still one of only a select few listed by *Yahoo!* at the top level of its catalog for math. Weisstein ¶ 11.

When *Treasure Troves/MathWorld* first appeared on the Internet in 1995, it included approximately 5,000 entries which were written by Dr. Weisstein. Weisstein ¶ 11. Hundreds of people began offering Dr. Weisstein and *Treasure Troves/MathWorld* their support. Weisstein ¶ 12. In addition to the many letters of support, dozens of people provided new entries and hundreds more offered technical advice and suggested ways to improve existing entries. Weisstein ¶ 12. This ongoing input from the user community, as well as Dr. Weisstein's own continuing work, means that the web site is (and will continue to be) in a constant state of

---

[1] The Internet can be searched using what is known as a "search engine." One common form is the subject directory search engine. A subject directory search engine is an index of web pages that are organized by subjects. However, the user will not obtain a list of all relevant sites, only those that the search engine's staff have determined to be interesting and important web sites. The best known of the subject directory search engines is *Yahoo!*

evolution. Weisstein ¶ 13, 77, 80. By April 1996, it contained over 7,000 entries. Weisstein ¶ 13. Today *Treasure Troves/MathWorld* contains over 9,000 entries and continues to receive high praise from the scientific community as it grows. Weisstein ¶ 38, 72.

**Adaptation of Dr. Weisstein's Internet Encyclopedia into a Book**

When Dr. Weisstein took a position as a research scientist at the University of Virginia in 1996, *Treasure Troves/MathWorld* followed him.[2] Weisstein ¶ 14, 56.

Many users of *Treasure Troves/MathWorld* encouraged Dr. Weisstein to adapt the web site into a book. Weisstein ¶ 13. Dr. Weisstein had some reservations; his web-based encyclopedia was not a static reference work, but a dynamic, interactive community which continued to grow and evolve whenever new entries were added or existing entries were edited or revised. Weisstein ¶ 13. He realized that a book could not evolve; it would merely be a "snapshot" of the encyclopedia at one instant in time. Weisstein ¶ 13.

At the same time, Dr. Weisstein realized there are some advantages to a book. A book is more convenient for some purposes than searching a number of web pages. Weisstein ¶ 13. Plus, the audience for the book would include not only current users of the Internet encyclopedia, but those without Internet access or those who are not comfortable with the Internet. Weisstein ¶ 13. Finally, Dr. Weisstein knew that a published book would enhance his reputation in the academic community. Weisstein ¶ 14. Thus, he made up his mind to publish an adaptation of *Treasure Troves/MathWorld* in book form. Weisstein ¶ 15.

**Dr. Weisstein's Dealings With CRC**

In the spring of 1996, Dr. Weisstein submitted a nearly complete manuscript to a number of publishers including CRC. Weisstein ¶ 15. CRC was the first to respond. CRC asked a mathematician to review the manuscript. Weisstein ¶ 16. Timothy Pletcher, an editor at CRC, forwarded Dr. Weisstein the review. Weisstein ¶16.

Encouraged by the review and CRC's interest, Dr. Weisstein continued his contact with CRC through Mr. Pletcher. Weisstein ¶ 17. In his discussions with Mr. Pletcher, Dr. Weisstein made clear that he wanted to maintain his web site and that he intended to maintain it as a free

---

[2] Since 1995, *Treasure Troves/MathWorld* has been available continuously to the public free of charge. During that time, *Treasure Troves/MathWorld* has been located on a computer at Caltech, on a computer at the University of Virginia's Astronomy Department, on Dr.

and publicly available site. Weisstein ¶ 22, 27.   Mr. Pletcher never indicated that CRC would seek to stop that. Weisstein ¶ 22, 27.

On March 6, 1997, Mr. Pletcher informed Dr. Weisstein that due to a reorganization at CRC he would no longer be the editor responsible for math titles. Weisstein ¶ 21.  Mr. Pletcher told Dr. Weisstein to contact Robert Stern who would "pick up where [Mr. Pletcher] left off." Weisstein ¶ 21.

Dr. Weisstein contacted Mr. Stern.  They discussed the *Treasure Troves/MathWorld* web site, preparation of the manuscript for publication, and Dr. Weisstein's ideas for a CD-ROM version of the book. Weisstein ¶ 21.  What was not discussed were the terms of the contract between Dr. Weisstein and CRC. Weisstein ¶ 21.  Nor was there any indication that CRC would seek to control Dr. Weisstein's web site, despite Dr. Weisstein telling Mr. Stern that it was his intention to maintain it as a free public site. Weisstein ¶ 22, 24, 27.

On April 4, 1997, Mr. Stern sent Dr. Weisstein the Author Agreement. The Author Agreement was drafted by CRC and presented to Dr. Weisstein as a standard form contract. Weisstein ¶ 22, 23.  Mr. Stern described it as "very straight forward [sic]." Weisstein ¶ 22.  Dr. Weisstein understood this to mean. he and CRC were in agreement on the items that had been discussed, including the fact that Dr. Weisstein intended to maintain his web site and that it would be free to anyone who wanted to access it. Weisstein ¶ 24.  This understanding was reinforced by the detailed definition of the term "Work" that CRC included in the Author Agreement:

> *The Work shall consist of approximately 1400 camera-ready manuscript pages and include[ing] approximately 1200 camera-ready illustrations to yield a completed work of approximately 1408 printed pages[.]*   Author Agreement at ¶1b; Weisstein ¶ 25.

After he received the Author Agreement, Dr. Weisstein attempted to negotiate several of the terms contained within it. Weisstein ¶ 23. With one small exception, CRC refused to negotiate. Weisstein ¶ 23.  Mr. Stern told Dr. Weisstein the Author Agreement was a standard contract and that he could take the standard deal or leave it. Weisstein ¶23.

---

Weisstein's personal web site, and now a site hosted by WRI where it is known as *Eric Weisstein's World of Math*. Weisstein ¶ 10, 17, 30, 51, 56, 64.

Before Dr. Weisstein signed the Author Agreement, he and Mr. Stern again discussed his *Treasure Troves/MathWorld* site. Weisstein ¶ 25. Dr. Weisstein told Mr. Stern that he intended to continue to develop the web site. Weisstein ¶ 29. They also discussed using the web site to promote the book and potential CD-ROM version. Weisstein¶ 29. Mr. Stern told Dr. Weisstein that CRC would not have a problem with him maintaining his web site. Weisstein ¶ 24. He also said that other CRC books were associated with free public web sites, citing *The Handbook of Applied Cryptography*[3] as an example. Weisstein ¶ 24.

Despite Dr. Weisstein's attempts to negotiate the terms, CRC was willing to make only one change – raising the royalty on derivative works from 5% to 10%. Weisstein¶ 26. After agreeing to this one change, CRC asked Dr. Weisstein to sign the original Agreement claiming it would substitute a corrected page. Weisstein ¶ 26. Dr. Weisstein signed the contract and returned it to CRC to be countersigned. Weisstein ¶ 25, 26. CRC did substitute a modified page when it signed the contract. Weisstein ¶ 26. However, the numbering and content of the inserted page did not match that of the original contract. Further, Dr. Weisstein was never asked to countersign the modified page. Weisstein ¶ 26. Even though CRC gave Dr. Weisstein no option but to agree to their standard form contract, the resulting document was still bungled. Weisstein ¶ 26.

In the months before and for many months after the publication of the *Concise Encyclopedia*, CRC's statements and actions reinforced Dr. Weisstein's understanding that his contract with CRC covered only the manuscript and did not cover the *Treasure Troves/MathWorld* web site. For example:

- Both the book and the CD-ROM are derivative works from the web site; not the other way around. Weisstein ¶ 13.
- Mr. Stern told Dr. Weisstein CRC would have no problem with him continuing to develop his web site. Weisstein ¶ 24.
- Mr. Stern knew Dr. Weisstein intended to continue developing his web site, yet never told him the web site would be part of the assignment to CRC. Weisstein ¶ 24, 25.
- CRC represented to Dr. Weisstein that the CD-ROM project required a contract separate from the book deal because each contract covered a specific adaptation of

---

[3] CRC's *Handbook of Applied Cryptography* is still available for free via the Internet and can be viewed at *http://cacr.math.uwaterloo.ca/hac/*.

Dr. Weisstein's web site and they were "independent." CRC said that the Author Agreement covered only adaptations from the paper manuscript. In fact, CRC required that Dr. Weisstein sign a separate contract for the CD-ROM version of the encyclopedia.[4] Weisstein ¶ 35.

- The introduction appearing in every copy of the book version of the *Concise Encyclopedia* contains the history of *Treasure Trove/MathWorld*, including URL addresses which will link that computer user to the web site. Weisstein ¶ 35.

- Similarly, each page of the CD-ROM contains a link to both *www.treasure-troves.com/* and *www.treasure-troves.com/math/* (both of which are web addresses and sites owned by Dr. Weisstein and which link the user to *Treasure Troves/MathWorld*). Weisstein ¶ 35.

- The introduction page of the CD-ROM version identifies the CD-ROM as an adaptation of the *Treasure Troves/MathWorld* web site: *Concise Encyclopedia of Mathematics CD-ROM: A Treasure Trove of Mathematical Formulas, Facts, Figures, and Fun*. Weisstein ¶ 35.

- Each of the thousands of pages of encyclopedia material on the CD-ROM published by CRC contains the copyright statement "© 1996-9 Eric W. Weisstein, 1999-05-26." Weisstein ¶ 35.

About three weeks after he signed the Author Agreement, Dr. Weisstein and Mr. Stern met to discuss the book and the possibility of creating a CD-ROM version. Weisstein ¶ 28. During the meeting Dr. Weisstein showed Mr. Stern *Treasure Troves/MathWorld* and they discussed its use as a promotional tool and the fact that Dr. Weisstein wanted the web site to remain freely available. Weisstein ¶ 29.

Mr. Stern was enthusiastic about using the web site as a way to promote the book. Weisstein ¶ 30. His only concern was that someone could download the entire web site, thus eliminating the need to buy the book. Weisstein ¶ 30. Dr. Weisstein explained why this would not be a problem and how to prevent whole-sale downloading. Weisstein ¶ 30. Despite Dr. Weisstein's explanations and assurances, Mr. Stern told him that it might be a good idea to

---

[4] As with the book contract, CRC refused to negotiate any of the terms (other than once again increasing the royalty from 5% to 10%), claiming the terms were standard industry-wide. Weisstein ¶ 42.

impair the functionality of the web site once the book was published. Weisstein ¶ 33. This was the first time CRC suggested that the web site be hobbled. Weisstein ¶ 33. At no time did Mr. Stern ever indicate that this request had any basis in the contract or copyright law – his only stated motivation was to ensure greater book sales. Weisstein ¶ 33.

In December 1998, Dr. Weisstein's adaptation of his *Treasure Trove/MathWorld* web site was published by CRC as *The Concise Encyclopedia of Math* ("*Concise Encyclopedia*"). Weisstein ¶ 45. Dr. Weisstein disagreed with Mr. Stern's assessment that by leaving the web site intact the book would be vulnerable because potential buyers would instead download the encyclopedia. Weisstein ¶ 39. In fact, the opposite proved to be true – the web site is the single best marketing tool the book and CD-ROM enjoy. Weisstein ¶ 33, 67, 68(1), 69, 75, 76. However, because CRC had years of experience marketing books, and in the name of working together, after the *Concise Encyclopedia* was published Dr. Weisstein blocked portions of his web site each day.[5] Weisstein ¶ 42. As evidenced by angry e-mail messages, blocking the web accomplished nothing except to upset potential customers:

> "*As a regular user of your wonderful work, I must say I'm particularly [sic] deceived by the way your web site happens to evolve. I consider this a HUGE achievement, the \*first\* real online encyclopedia, NOW IT'S JUST ANOTHER MATH BOOK !! Do CRC really expect to sell more books because the online version is now crippled?*" Weisstein ¶ 42.

The first printing of the *Concise Encyclopedia* sold out in a matter of months. Weisstein ¶ 42. Before and after publication of the book, Dr. Weisstein continued to add material to his *Treasure Troves/MathWorld* web site. Weisstein ¶ 37. Dr. Weisstein also implemented more sophisticated methods for preventing users from downloading *Treasure Troves/MathWorld* and in June 1999 removed the clumsy day-by-day alphabetical blocking. Weisstein ¶ 48.

**Wolfram Research, Inc., and Its Association with Dr. Weisstein**

WRI is a creator and publisher of software products. Its principal product is its very successful *Mathematica* software. Gray ¶ 3, 4. In addition to its commercial ventures, WRI supports a number of ongoing projects which enrich the community, but may never yield any financial benefit to the company. Gray ¶ 12–14. For example, WRI sponsors math awareness

---

[5]CRC did not give any guidance to Dr. Weisstein as to how to accomplish this. Thus, Dr. Weisstein blocked various entries each day based on the letter of the alphabet with which the entry began. Dr. Weisstein changed the letter to be blocked each day. By revisiting the site over a period of days, users would still have access to the entire encyclopedia. Weisstein ¶ 41.

events and hosts public Internet sites related to mathematics. Examples, in addition to *Treasure Troves/MathWorld*, include *www.integrals.com* and the soon to be available *www.specialfunctions.com*. Gray ¶ 12–13. WRI also offers tens of thousands of pages of technical information free to the public in its online library. Gray ¶ 14.

*Treasure Troves/MathWorld* is a well-established Internet encyclopedia that is relied upon by thousands of students, educators, academics departments, and technical professionals. Weisstein ¶ 72. Students of mathematics, including many of the mathematicians and scientists who work for WRI, refer to the web site on a daily basis. Weisstein ¶ 72; Gray ¶ 34, 35. The WRI employees who used *Treasure Troves/MathWorld* were aware of the great investment of time and money required just to maintain such a comprehensive encyclopedia—not to mention that required to continuously update the encyclopedia. Gray ¶ 34. They were concerned that such an important site would eventually have to shut down due to the costs associated with running it. Gray ¶ 35. To ensure the existence of the site, WRI considered sponsoring it. Gray ¶ 35-36. The idea of sponsoring *Treasure Troves/MathWorld* dovetailed with WRI's mission of encouraging mathematics education. Gray ¶ 37. Thus, in February 1999, Dr. Weisstein was invited to WRI to speak about his *Treasure Troves/MathWorld* web site. Weisstein ¶ 49. After his presentation, WRI offered Dr. Weisstein a full-time position as an encyclopedist. Weisstein ¶ 49.

In June 1999, Dr. Weisstein joined WRI. Weisstein ¶ 51. At WRI, Dr. Weisstein and several other WRI employees enhanced *Treasure Troves/MathWorld* with graphic designs and a subject–based index. Weisstein ¶ 61–64. As always, the encyclopedia was continuing to evolve as new entries were created. Weisstein ¶ 61–64. In December 1999, after six months of work, the new design was complete and *Eric's Treasure Trove of Mathematics* was renamed *Eric Weisstein's World of Mathematics*. At the same time, it was moved to a WRI–owned computer. Weisstein ¶ 64. As with its other community service projects, WRI expects no tangible commercial benefit from its sponsorship of *Treasure Troves/MathWorld*. Gray ¶ 15, 36-38.

Shortly after Dr. Weisstein joined WRI, WRI and CRC met to discuss the development of several joint projects between the companies. Weisstein ¶ 55, 57. Despite their belief that Dr. Weisstein owned the copyright in his *Treasure Troves/MathWorld* web site, Dr. Weisstein and WRI discussed with CRC the move of *Treasure Troves/MathWorld* to WRI's computers. Gray ¶ 52, 54, 55, 56. WRI hoped that the companies might develop several cooperative ventures using

the synergies that exist between traditional publishing and the Internet, such as the obvious marketing assistance Dr. Weisstein's web site provides for the *Concise Encyclopedia*. Gray ¶ 56; Weisstein ¶ 30.

**Dr. Weisstein's Internet Encyclopedia is a Valuable Resource**

Thousands of students, educators and researchers rely on *Treasure Troves/MathWorld* on a daily basis. Weisstein ¶ 72. Since 1995, the site has been continuously and freely available for public use. Weisstein ¶ 56, 81. Its comprehensive nature makes it unlike anything else. Not only is the web site an invaluable tool for users, it serves as a key marketing tool for the *Concise Encyclopedia* and the only marketing tool for the CD-ROM version. Weisstein ¶ 75-76.

CRC has done almost no meaningful promotion of the *Concise Encyclopedia*. Despite the *Concise Encyclopedia* being CRC's best selling math book, it is not offered for sale in CRC's promotional "Best of Math" flyer. Weisstein ¶ 65, 66, 67, 68(i), 69, 75. Further, the **only** place to learn about the CD-ROM is on the *Treasure Troves/MathWorld* web site. Weisstein ¶ 69, 76. Thus, all CD-ROM sales are a direct result of the web site. Weisstein ¶ 76. On a number of occasions, even Mr. Stern and CRC agreed that the web site enhanced the sales of the *Concise Encyclopedia* and the CD-ROM version. Weisstein ¶ 33, 53.

The move of Dr. Weisstein's Internet encyclopedia to WRI's computers has caused no change in the traffic to the site. *Treasure Troves/MathWorld* was a well established web site for years before it was moved to WRI's computers. Gray ¶ 40; Weisstein ¶ 80. Hyperlink association of WRI's web site to *Treasure Troves/MathWorld* has not significantly increased the traffic to *MathWorld*. Well under 1% of current visitors to *MathWorld* come by way of WRI's web site link to *MathWorld*, and vice versa. Gray ¶ 43.

There is no danger that users of the Internet encyclopedia will download it in lieu of buying the book or CD-ROM. *Treasure Troves/MathWorld* contains automated access limits. Weisstein ¶ 73, 74. The amount of material that can be downloaded is extremely limited and repeated efforts to download any more than 10% of *Treasure Troves/MathWorld* results in loss of access to the site. Weisstein ¶ 48, 74. Further, even if it were possible to download the entire encyclopedia, it is impractical as it would take almost nine hours to print out the 12,600 pages (equal to a stack of paper four feet high and weighing over 120 pounds) at an estimated cost of $630. Weisstein ¶ 74.

## III. ARGUMENT

### 1. CRC WILL LOSE ON THE MERITS

CRC's attempt to control Dr. Weisstein's web site has no basis in law or fact. The copyright assigned to CRC by Dr. Weisstein did not include his *Treasure Troves/MathWorld* web site.

#### A. CRC's rights do not include *Treasure Troves/MathWorld*.

As the author of *Treasure Troves*, Dr. Weisstein alone owns the copyright in that original Work. 17 USC §201(a). When Dr. Weisstein adapted *Treasure Troves* to create the *Concise Encyclopedia*, he created a derivative work. 17 USC §103. As its only author, Dr. Weisstein owned the copyright in the derivative *Concise Encyclopedia* too. 17 U.S.C. §§ 103, 201(a). Whereas Dr. Weisstein's rights arose from his authorship of these works. CRC obtained its rights by assignment from Dr. Weisstein. The fallacy of CRC's argument is that it now claims to own rights that Dr. Weisstein never assigned it.

It is a legal truism that the rights CRC acquired in the *Concise Encyclopedia* are limited to what Dr. Weisstein assigned to it in the Author Agreement.[6] 17 U.S.C. § 201d; *Infodeck , Inc. v. Meredith Webb Printing, Inc.*, 830 F. Supp. 614, 619 (N.D. Ga. 1993). In order to understand the scope of those rights, the Court must examine that Agreement. There is no language in the Author Agreement giving CRC any rights in the *Treasure Troves* as it existed before Dr. Weisstein created the *Concise Encyclopedia,* or as it exists today under its new name *MathWorld.*

In the Author Agreement, Dr. Weisstein assigned to CRC "*full and exclusive rights to the Work, including, without limitation, the copyright in the Work, all revisions thereof, and the right to prepare translations and other derivative works based upon the Work . . .*" Author Agreement, ¶ 5. The Author Agreement defines the assigned Work as "*approximately 1400 camera-ready manuscript pages and include[ing] approximately 1200 camera-ready Illustrations to yield a completed work of approximately 1408 printed pages.*" Author Agreement, ¶ 1(b). That language gives CRC rights only to the 1408–page manuscript

---

[6] Or in the later Electronic and Database Author Agreement for the CD-ROM version of the *Concise Encyclopedia,* which CRC largely ignores in its Motion. We think CRC fails to mention the Electronic Database Author Agreement because it conflicts with its theory that it acquired the rights to all of Dr. Weisstein's math encyclopedia-related works in the Author Agreement. If that were true, then the Electronic Database Author Agreement would not have been needed.

(ultimately 1969 pages when published) which Dr. Weisstein describes as a "snapshot" of his web site at the time. There is simply nothing in the Author Agreement to support CRC's claim that it acquired rights in *Treasure Troves/MathWorld,* the senior work from which the 1969-page *Concise Encyclopedia* was adapted.

The 1969 pages of camera-ready manuscript are a derivative work of Dr. Weisstein's *Treasure Troves/MathWorld.* These pages were transformed or adapted from the already-existing *Treasure Troves/MathWorld* material. 17 U.S.C. § 101. Thus, the rights that CRC acquired in the derivative *Concise Encyclopedia* are independent of Dr. Weisstein's preexisting rights in his *Treasure Troves/MathWorld.* In general, creating a derivative work does not affect or diminish an author's rights in the senior, preexisting work. The Copyright Act itself makes this axiomatic:

> The copyright in a . . . derivative work extends only to the material contributed by the author of such work, as distinguished from the preexisting material employed in the work, and does not imply any exclusive right in the preexisting material. The copyright in such work is independent of, and does not affect or enlarge the scope, duration, ownership, or subsistence of, any copyright protection in the preexisting material.

17 U.S.C. § 103(b); *see also* H.R. Report No. 94-1476 at 57 (1976)("copyright in a 'new version' covers only the material added by the later author, and has no effect one way or the other on the copyright or public domain status of the preexisting material"). The full force of Dr. Weisstein's rights in the preexisting *Treasure Troves/MathWorld* is preserved despite the derivative work. 17 U.S.C. § 103(b); *Stewart v. Abend,* 495 U.S. 207, 223 (1990). And it is irrelevant that the preexisting *Treasure Troves/MathWorld* maybe inseparably intertwined with the derivative work manuscript. *Id.* Thus, as a matter of copyright law, Dr. Weisstein's assignment of the rights in the manuscript did not diminish or affect his preexisting copyrights in *Treasure Troves/MathWorld.*

Contract law yields the same result. It is a well-settled rule of contract construction that the expression of one term implies the exclusion of other terms not mentioned[7]; if CRC had wanted the term "Work" to include the web site, it would have been a simple matter for it to say

---

[7] *"Expressio unius est exclusio alterius." See City Of Homestead v. Johnson,* 2000 Fla. LEXIS 544, *8, n. 6 (Fla. 2000).

so expressly. It did not, and it should not be allowed to escape the consequences of that failure now.

Indeed, as Dr. Weisstein explained in his declaration, it would have made no sense for him to grant CRC rights in the senior work. That would have been completely at odds with his life's ambition to create a unique math resource on the Internet. Weisstein ¶ 27, 79, 80. As Mr. Gray also explains in his declaration, it would be entirely contrary, even nonsensical, for Dr. Weisstein to subordinate the rights in *Treasure Troves/MathWorld* to the rights in the later-created *Concise Encyclopedia*. The unique nature of Dr. Weisstein's web-based encyclopedia is such that it cannot continue to thrive and grow if reduced to being the handmaiden of the static and lesser *Concise Encyclopedia*, a never-changing "snapshot" of the web site which grows ever more obsolete each day. Gray ¶ 18, 21, 23-28.

Florida law[8] requires the Court to construe the Author Agreement according to its plain language. *Rose v. M/V "Gulf Stream Falcon"*, 186 F.3d 1345, 1350 (11th Cir. 1999 )("It is well settled that the actual language used in the contract is the best evidence of the intent of the parties and, thus, the plain meaning of that language controls") (*citing Green v. Life & Health of America*, 704 So. 2d 1386, 1391 (Fla. 1998)) *Sugar Cane Growers Coop. of Florida Inc. v. Pinnock*, 735 So. 2d 530, 535 (Fla. 4th DCA 1999)("In construing a contract, the legal effect of its provisions should be determined from the words of the entire contract"). The plain language of the Author Agreement quoted above makes clear that CRC's rights are limited to the derivative *Concise Encyclopedia* (and derivatives such as translations or static electronic images of the printed book pages), but do not include rights in the senior work, *Treasure Troves/MathWorld*. Thus, as a matter of straightforward contract construction, CRC's claim to control Dr. Weisstein's web site is baseless.

B. **Any Ambiguity Must Be Resolved Against CRC**.

Even if CRC were to successfully identify an ambiguity in the Author Agreement, that ambiguity must be resolved against CRC.[9] Under Florida law, if an agreement is ambiguous, it is

---

[8] The Author Agreement specifies that the internal law of Florida controls issues of contract construction. ¶ 16(h).

[9] Defendants contend that the relevant terms of the Agreement are not ambiguous, but must concede that the document is a mess. CRC chose to use a form contract ill-suited to Dr. Weisstein's book. It refused any negotiation of the largely boilerplate language of the document, telling Dr. Weisstein incorrectly that the terms are standard in the industry. (The Court can see

Case 1:00-cv-00893-DLG   Document 39   Entered on FLSD Docket 04/27/2000   Page 14 of 46

CASE NO. 00-00893-CIV-GRAHAM/TURNOFF

the court's responsibility to resolve the ambiguity by identifying what the parties intended, and construing the agreement to effectuate that intent. *In re: Phillip Watts Enters.*, 186 B.R. 735, 738 (Bankr. N.D. Fla. 1995)('cardinal rule of contract construction [is] that the intention of the parties governs') (*quoting Dune Inc. v. Palms North Ass'n*, 605 So.2d 903, 905 (Fla. 1ˢᵗ DCA 1962)). In order to ascertain the parties' intent, the court is to apply well-established rules of contract construction for resolving ambiguities. *In re: Phillip Watts*, 186 B.R. 739 (court may consider extrinsic evidence to construe ambiguous language) and *Vienneau v. Metropolitan Life Ins. Co.*, 548 So.2d 856, 859 (Fla. 4ᵗʰ DCA 1989)(court may consider extrinsic evidence such as the circumstances surrounding the making of the contract, the relationship of the parties and their course of dealing). Application of those rules here confirms that CRC acquired no rights in *Treasure Troves/MathWorld*.

     1.   ***Parol Evidence***. In resolving an ambiguity like the ambiguity CRC appears to urge here, a court may consider the oral statements of the parties at or about the time of contracting. "[W]hen a contract is rendered ambiguous by some collateral matter, it has a latent ambiguity, and the court must hear parol evidence to interpret the writing properly." *Rx Solutions, Inc. v. Express Pharm Servs. Inc.*, 746 So. 2d 475, 476 (Fla. 2d DCA 1999) (*citing Landis v. Mears*, 329 So. 2d 323 (Fla. 2d DCA 1976)). A latent ambiguity occurs "where the language employed is clear and intelligible and suggests but a single meaning, but some extrinsic fact or extraneous evidence creates a necessity for interpretation or a choice among two or more possible meanings." *Id* at 477 (citing *Ace Elec. Supply v. Terra Nova Elec.*, 288 So. 2d 544, 547 (Fla. 1ˢᵗ DCA 1973)). The record evidence here is that Dr. Weisstein told Pletscher before the Author Agreement was signed that he wished to maintain control over the web site. Weisstein ¶ 22, 27. No one from CRC told Dr. Weisstein that the Author Agreement would not permit Dr.

---

for itself that this was not true by consulting the Authors' Guild web site at http://www.authorsguild.com/contractadvice.html.) Worst of all, after Dr. Weisstein signed, but before CRC signed the Agreement, CRC substituted a new page three. In carelessness or haste, CRC failed to note that the page breaks of the new page three do not match the page breaks of the old page three. The result is that the final version of the contract features confusing redundancies, broken and incomplete sentences and gaping omissions in paragraphs 5 and 7. Paragraph 5, of course, is the paragraph in which Dr. Weisstein attempted to assign the copyright in the 1408–page manuscript to CRC. See Author Agreement ¶ 5-7.

     The fact that Dr. Weisstein never signed the final version of the Author Agreement means that there is considerable doubt whether CRC owns the copyright even to the *Concise*

Weisstein to control the web site in the future. Weisstein ¶ 24, 25, 80. Indeed, CRC expressed no interest whatever in the web site until *after* the Author Agreement was signed. Weisstein ¶ 24, 70, 80. Dr. Weisstein's consistently expressed desire to continue to control the future of *Treasure Trove/MathWorld* is illustrated by his contemporaneous email to Susan Ann Protter, the literary agent he considered hiring to represent him in his negotiations with CRC:

> *I believe that continuing to maintain a publicly available web site is useful. In fact, it may even serve as a useful marketing strategy. For instance, I have already received about 50 inquiries from people wishing to purchase a published copy.* Weisstein ¶ 19.

There can be no serious dispute that if he believed that the Author Agreement would limit his ability to control *Treasure Trove/MathWorld* in the future, Dr. Weisstein would not have signed the Agreement:

> *I have worked innumerable 70+ hour weeks in order to continue developing my website into the world's best mathematics resource. The site existed for years before CRC ever knew it, or I existed. No one from CRC ever lifted a finger to help me develop the website . . . I never believed that CRC had any proprietary claim to my website, and CRC led me to believe that it had no intention of asserting any such claim. The website is, and always has been, mine and mine alone.* Weisstein ¶ 80.

2. ***Course of Dealing***. In attempting to ascertain the parties' intent (for the purpose of resolving an ambiguous contract term), a court may also consider the parties' course of dealing. *Vienneau*, 548 So.2d at 859. The relevant dealings for this purpose may include the course of dealing *under* the contract in question or the course of dealing in subsequent contracting. *Cox v. CSX Intermodal, Inc.*, 732 So. 2d 1092, 1096 (Fla. 1st DCA 1999)(written contracts even may be modified by a course of dealings). Here, both demonstrate that the parties did not intend, or understand, the Author Agreement to give CRC rights to control *Treasure Trove/MathWorld*.

The parties' course of dealing *under* the Author Agreement was that Dr. Weisstein continued to exercise exclusive control over *Treasure Troves/MathWorld* just as he had done before the Author Agreement was signed. Although CRC later attempted to convince Dr. Weisstein that it should determine the future of the site, in practice it was Dr. Weisstein alone who determined when and to what degree the site would be available to users. Weisstein ¶ 41,

---

*Encyclopedia*. The Copyright Act is inflexible in requiring the author's signature. 17 U.S.C.

48, 73, 80, 24, 29, 56. It was Dr. Weisstein who determined which computers would host the site and at which internet addresses. Weisstein ¶ 10, 24, 35, 17, 30, 51, 64, 56. It was Dr. Weisstein who determined what security measures would be imposed to thwart copying of the site. Weisstein ¶ 41, 48, 73, 27. It was Dr. Weisstein who claimed ownership of the copyrights in the site in the statutory copyright notices. Weisstein ¶ 35, 64. And it was Dr. Weisstein who controlled the content of the site. Weisstein ¶ 10-12, 56, 41, 48, 73, 80, 24, 29, 56.

Throughout its relationship with Dr. Weisstein, CRC showed little interest in *Treasure Troves/MathWorld* until it sensed an opportunity to coerce "hard compensation" from WRI and Stephen Wolfram more than a year after the Author Agreement was signed. Weisstein ¶ 24, 29, 70, 53; CRC Brf. at 12-13. Of course, CRC's opportunism at that late date contrasts sharply with its conduct at the time of contracting and for the year that followed during which the contract was performed. The course of dealing evidence evinces unmistakably that the parties understood and intended that the Author Agreement gave no rights to CRC in *Treasure Troves/MathWorld*. *Hibiscus Assoc. Ltd. v. Board of T'ee of the Policeman & Fireman's Retirement Sys.*, 50 F.3d 908, 919 (11th Cir. 1995)(when a contract is ambiguous the conduct of the parties is the best evidence of their intent).

The parties' course of contracting also shows that the Author Agreement gave CRC no rights in *Treasure Troves/MathWorld*, and that CRC surely knew it. That is why, several months after delivering the 1969–page manuscript, when Dr. Weisstein agreed to prepare a CD-ROM version of the *Concise Encyclopedia*, CRC insisted that the parties execute a new contract covering the CD-ROM. That contract, the Electronic and Database Author Agreement, would have been superfluous if the Author Agreement had given CRC rights to all of Dr. Weisstein's math encyclopedia-related works. Weisstein ¶ 34, 43; Gray ¶ 29. CRC's insistence on a new contract to cover the new CD-ROM demonstrates that CRC understood that its rights under the Author Agreement were limited to the physical 1969–page manuscript specifically assigned in the Author Agreement and did not include Dr. Weisstein's other works, including *Treasure Troves/MathWorld*.

3. *Trade Usage*. When construing an ambiguous contract term, courts also look to relevant trade usage to ascertain the parties' intent. *In re: Phillip Watts*, 186 B.R. at 739 –740 (In considering the usage of trade in interpreting a contract, the court took into account an A.B.A.

---

204(a).

article addressing drafting of the type of contract at issue). While there may be no trade usage *per se* bearing upon the scope of the rights Dr. Weisstein assigned to CRC in the Author Agreement, there are relevant practices in Internet publishing that shed light on what the parties surely intended. Mr. Gray explained in his affidavit that interactive web sites like *Treasure Troves/MathWorld* are different than books and people in the publishing world understand the important differences:

> *Some traditional publishers, including CRC, now post what amount to images of printed books at websites. But CRC knew or should have known the difference between Eric's dynamic, collaborative, evolving website – which preceded the book, made it possible, and has evolved further since its publication – and a website which merely reproduces [static images of] a traditionally created and published book.* Gray ¶ 31.

Because of this difference, the reasonable expectation would be that the Author Agreement would not include the copyright in *Treasure Trove/MathWorld* unless it expressly said so. Gray ¶ 29-30. In the absence of express language, no assignment of those rights was intended. *Id.*

   4. ***Contracts are Construed Against the Draftsman***. Courts construe the vague or ambiguous contract terms against the party who drafted the contract. *City of Homestead v. Johnson*, 2000 Fla. LEXIS 544 (Fla. 2000)("an ambiguous term in a contract is to be construed against the drafter") (*citing Planck v. Traders Diversified, Inc.*, 387 So. 2d 440 (Fla. 4th DCA 1980) (rule that a contract is construed against the drafter is "especially true when the drafter . . . [has] greater professional or business knowledge"). That is especially true if the contract is a contract of adhesion as is true here. *Allapattah Servs. v. Exxon Corp.*, 61 F. Supp. 2d 1308, 1320 n.20 (SD Fla. 1999)(" it is a basic tenet of contract law, especially in the context of adhesion contracts, that ambiguities be interpreted against the party that drafted the contract").

   Because CRC drafted the documents, dictated the terms and refused any negotiation, the infirmities in the Agreement are CRC's responsibility alone. Weisstein ¶ 22, 23, 26. To the extent that there is any ambiguity in the Court's mind as to the scope of the rights transferred to CRC in the Author Agreement, this rule of contract construction (as well as those discussed above) requires that the ambiguity be resolved against CRC.[10]

---

[10] Even if the Court were to construe the Author Agreement differently than Dr. Weisstein (and we believe that the Court should not), the Court should nonetheless give Dr. Weisstein relief from the Author Agreement. Florida will grant relief for a unilateral mistake where the mistake

## 2. THERE IS NO IRREPARABLE HARM

CRC argues that it is presumed to be suffering irreparable injury because it has established a likelihood of success on the merits. CRC Memorandum p. 18. That argument, of course, depends on CRC's false premise that it, rather than Dr. Weisstein, owns the copyright to *Treasure Trove/MathWorld*. Inasmuch as that balloon has been permanently punctured above, there can be no *presumption* of irreparable injury in this case.

Nor is there any injury in fact. CRC's affiant, Ronald Powers, has not done his homework. First, *Treasure Trove/MathWorld* is not a copy of the *Concise Encyclopedia*. Rather the *Concise Encyclopedia* is a copy of *Treasure Troves/MathWorld*. *Contra* Powers ¶ 5. Second, *Treasure Troves/MathWorld* has not suddenly appeared as "in substance a new edition of the [Concise] Encyclopedia". *Contra* Powers ¶ 5. It has been available on the Internet continuously since 1995 and is a senior work to the *Concise Encyclopedia*. Third, *Treasure Troves/MathWorld* has not "significantly reduced" the market for the *Concise Encyclopedia*. The opposite is true. The web site provides the best promotion the book enjoys and accounts for more sales of the book than all other promotions combined. Weisstein ¶ 75-76. That the web site supports rather than competes with the book is illustrated by the sales of the CD-ROM. There is virtually no other way for consumers to learn of the CD-ROM except through *Treasure Troves/MathWorld*. Yet, the CD-ROM has enjoyed substantial sales. Weisstein ¶ 75-76. The facts are, had CRC and Mr. Powers bothered to check, that Dr. Weisstein's web site is the driving force behind the success of the *Concise Encyclopedia*. The irony of CRC's Motion is that if the site is taken down, *then* CRC and Dr. Weisstein *will* suffer injury in reduced sales and royalties, respectively.

---

goes to the substance of the agreement, is not the result of a lack of due care, and where the other party has not relied upon the mistake to its detriment. *Ferguson v. Cotler, 382 So. 2d 1315, 1316 (Fla. 5th DCA 1980).* Dr. Weisstein easily can satisfy those elements here. The commercial realities were such that one would not expect the assignment of rights to include *Treasure Trove/MathWorld* and Dr. Weisstein acted reasonably in believing that those rights were not included in the assignment. Gray ¶ 29, 30. On the other hand, CRC should have known better. Gray ¶ 31. CRC has not relied to its detriment on Dr. Weisstein's mistake. Indeed, the opposite is true. It is Dr. Weisstein who has relied on CRC to his detriment. Unaware as he was of CRC's plan to grab for control of his web site, Dr. Weisstein *"gave up a promising career in academia, left a coveted faculty position at one of the country's finest institutions of higher education, pulled up stakes and trekked across the country to WRI. [He] would never have done any of that*

CASE NO. 00-00893-CIV-GRAHAM/TURNOFF

### 3. DR. WEISSTEIN WILL SUFFER AN INJURY

If the court enjoins continued operation of *Treasure Troves/MathWorld* site, Dr. Weisstein will suffer injury in lost royalties on the sale of the *Concise Encyclopedia* and the CD-ROM version. *See above.* Further, Dr. Weisstein has given up a prestigious position at the University of Virginia in the belief that he can, with WRI's sponsorship, work full time on his Internet encyclopedia. He cannot easily replace that lost position. More importantly, *Treasure Troves/MathWorld* is Dr. Weisstein's life work. Weisstein ¶ 79. For CRC to argue (CRC Memorandum p. 19) that his injury from an injunction will be negligible is shockingly cold-blooded. And it ignores that the Court sits as a court of equity. CRC can point to nothing that it will lose remotely comparable to what Dr. Weisstein stands to lose if the Court rules against him.

Finally, CRC's argument (CRC Memorandum p. 20) that WRI's "lost profits" should not count in balancing the relative equities is worse than specious. It is deceitful. WRI enjoys no profits from sponsoring Dr. Weisstein's web site. WRI sponsors the site *pro bono publico* and does so at a considerable cost. Gray ¶ 12-14, 36-38.

### 4. THE INJUNCTION WILL NOT SERVE THE PUBLIC INTEREST

There is no public interest served by enjoining the ongoing operations of the *Treasure Troves/MathWorld* web site while the parties litigate the meaning of the Author Agreement. On the other hand, allowing the site to continue in operation will permit tens of thousands of users worldwide to enjoy continued access to an important and unique resource whose value to students, mathematicians, scientists, educators, librarians and others the world over cannot be questioned.

---

*had [he] believed, even for a moment, that CRC could pull the plug on Treasure Troves whenever it felt like it."* Weisstein ¶ 79.

CASE NO. 00-00893-CIV-GRAHAM/TURNOFF

## IV.  CONCLUSION

For all of the foregoing reasons, the Court should deny the preliminary injunction.

Respectfully submitted,

RYNDAK & LYERLA
Attorneys for Defendants
30 North LaSalle Street, Suite 2630
Chicago, Illinois 60602
Telephone:    (312) 214-7770
Telecopy:     (312) 214-7715
E-mail:lyerla@ryly.com

By: _____
                Bradford Lyerla

OF COUNSEL:

Janet T. Munn, Esq.
STEEL HECTOR & DAVIS LLP
Attorneys for Defendants
200 South Biscayne Boulevard, Suite 4000
Miami, Florida 33131
Telephone:    (305) 577-2864
Telecopy:     (305) 577-7001
E-mail:jmunn@steelhector.com

DLSR&L/Wolfram/WRI Response

20

CASE NO. 00-00893-CIV-GRAHAM/TURNOFF

### CERTIFICATE OF SERVICE

I HEREBY CERTIFY that a true and correct copy of the foregoing was sent via fax and Federal Express this 24th day of April, 2000 to:  **ELLEN M. LEIBOVITCH, ESQ.,** Attorneys for Plaintiff, Adorno & Zeder, P.A., 2601 South Bayshore Drive, Suite 1600, Miami, Florida 33133 **AND DAVID RABINOWITZ, ESQ.,** Moses & Singer LLP, 1301 Avenue of the Americas, New York, New York 10019.

By: _____

Catherine L. Gemrich

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF FLORIDA

CASE NO. 00-893-CIV-GRAHAM/TURNOFF

CRC PRESS, LLC,

Plaintiff,

v.

WOLFRAM RESEARCH, INC., STEPHEN
WOLFRAM and ERIC WEISSTEIN,

Defendants.
_____/

**AFFIDAVIT OF DR. ERIC
WEISSTEIN IN RESPONSE TO
PLAINTIFF'S MOTION FOR
PRELIMINARY INJUNCTION**

STATE OF ILLINOIS      )
                       ) ss:
COUNTY OF CHAMPAIGN )

**BEFORE ME**, the undersigned authority, personally appeared Dr. Eric Weisstein, who being

duly sworn by me, deposes and says:

1. All statements contained in this Affidavit are true and correct, and based upon personal knowledge:

## PERSONAL AND BIOGRAPHICAL INFORMATION

2. I am currently a resident of Urbana, Illinois, where I have lived since joining Wolfram Research, Inc. ("WRI") in June 1999. My position at WRI is "encyclopedist." Before joining WRI, I held a Research Scientist faculty position in the Department of Astronomy at the University of Virginia ("UVa") in Charlottesville, Virginia from 1996–1999. Prior to my posting at UVa, I was a Staff Scientist in the Division of Geological and Planetary Sciences at the California Institute of Technology ("Caltech") in Pasadena, California.

3. After graduating in 1987 as valedictorian of my high school class in Bloomington, Indiana, I was awarded National Merit and Sen. Robert Byrd scholarships. I attended college at Cornell University in Ithaca, New York, where I received a B.A. in Physics *cum laude* and Phi Beta Kappa after three years of study. I was awarded an M.S. in Planetary Science from Caltech in 1993 and a Ph.D. in Planetary Science, also from Caltech, in 1996.

1

4       I have been a visiting scientist at NASA's Goddard Space Flight Center in Greenbelt, Maryland (1990) and a summer student at the Arecibo Radio Observatory in Arecibo, Puerto Rico (1989).

## "TREASURE TROVES" HISTORY AND EVOLUTION

5.      As a high school student, I began collecting my physics and science class notes and organizing them on a computer. I imagined that some day these notes could form the core of an encyclopedia of scientific knowledge which could be disseminated to students throughout the world.

6       During my freshman year at Cornell University in 1987, I began adding more class notes, as well as additional material from library books and published papers, into my growing mathematics, physics, and biographical encyclopedias. As my studies progressed and my notes grew, I realized that the growing collection of formulas and descriptions could serve not only as a resource for scientists and educators, but also as a way for people from all walks of life to explore the sciences.

7.      After I graduated from college in 1990, I continued to work extensively on both the math and physics encyclopedias. I made additional progress during the summer of 1990 while working as a visiting scientist at NASA's Goddard Space Flight Center.

8.      By the end of the summer of 1990, my math encyclopedia had reached about 100 pages of word-processed material, plus hundreds of pages of hand-written notes. In the fall of 1990, I began graduate studies at Caltech. The encyclopedia came with me.

9.      While at Caltech (1990–1996), I began the arduous task of converting all the documents stored on my computer into a format called "TeX" (pronounced "tek"). TeX is a typesetting language that is extensively used by academics in the authoring of scholarly articles. It provides professional-quality output for complicated formulas; a necessity for my formula-laden encyclopedia. I also knew that there existed software programs for turning TeX files into web pages (i.e., documents suitable for display on the Internet), whose massive potential was clear to me even then. I also added thousands of new entries to the encyclopedia during this period.

10.     The Internet seemed to hold the promise of unlimited distribution for my encyclopedias for which I had hoped. This hope was realized beginning in 1995, when the Internet boom was in full swing and I learned of free software which could help me convert my files into a form useable on the Internet. Using a combination of this software and additional software which I wrote myself, I created one of the first Internet encyclopedias of science. In 1995 my site, *Eric's Treasure Troves of Science* first appeared on the Internet, from its "home" on a computer at Caltech. It has been continuously available to the public free of charge from various Internet addresses ever since.

11.     The year 1995 was a very exciting time for me as I watched my years of labor find an immediate and enthusiastic audience. My site, which contained about 5,000 entries at this time, was included in the earliest web "indexers," programs designed by major internet portals to seek out and catalog interesting and important sites on the Internet. For

2

example, my site received prominent placement in the fledgling *Yahoo!* Internet site, where *"Eric's Treasure Trove of Mathematics"* is, even today, one of only a few sites listed by *Yahoo!* on the "top" of its Internet catalog for math.

12.   As the site became more widely known and used, dozens of contributors offered new entries, while hundreds of others offered technical advice, criticism, and kind messages. It was a hugely rewarding experience for me to receive such encouragement from users around the world, and it also meant that the website was in a constant state of evolution. In addition to being a labor of love for me, it was immediately apparent from the comments and submissions I received that a growing community of users viewed the site as a crucial math and science resource, just as I had hoped they would.

## THE DECISION TO CREATE A PRINTED "SNAPSHOT" OF THE WEBSITE

13.   In 1995--6, I began to receive messages from *Treasure Troves* readers who encouraged me to adapt the site for a book. Given the dynamic and interactive nature of the website (which by April 1996 contained some 7,000 distinct entries), I was unsure if a static "snapshot" of the site in book form could be truly representative of the site. However, I also wanted to widen the audience for my work by making it accessible to pre-college educators, people less comfortable with the Internet, and those without access to the Internet.

14.   At this time, I was about to accept a position at the University of Virginia, to begin in July of 1996. I decided that as a young scientist just beginning my professional career, a book adaptation of the web encyclopedia would advance my reputation in academia. Although I considered the website my primary contribution to the spread and advancement of mathematics, I believed a "snapshot" of the site in printed form would be useful to my résumé.

15.   With these goals in mind, I began seeking a publisher for the mathematics portion of my *Treasure Troves* beginning in February of 1996. During the next few months, I offered a lengthy paper manuscript to several publishers of scientific and technical books, including Springer-Verlag/New York, CRC Press ("CRC"), and Cambridge University Press/New York. I had never had any experience with book publishers; I certainly was not aware back then that it was in any way unusual for an author to offer a nearly-complete manuscript to potential publishers "on spec."

16.   On June 28, 1996, I received a fax from Timothy Pletscher ("Mr. Pletscher"), an editor at CRC. He forwarded me a short review of my manuscript which he had received from mathematician Daniel Zwillinger ("Mr. Zwillinger"). CRC had contacted Mr. Zwillinger to evaluate my manuscript. His review was complimentary.

17.   Encouraged by CRC's initial response, on September 27, 1996 I again contacted Mr. Pletscher with an e-mail which stated, in relevant part, *"As I recall, there were a few outstanding issues left, including ... how to format a CD-ROM version. ... [and] the possibility of maintaining my present WWW site http://www.astro.virginia.edu/~eww6n/ math/math.html (or a site like it) once the CD is out, not to mention contractual details."*

3

18    During this time, I also received an unsolicited note from an editor at Birkhäuser Publishing expressing interest in my book. In a November 7, 1996 response, I wrote, in relevant part:

> "In the two months for which my pages have been available on the current server, I have received 8500 hits on the top page, and approximately 100,000 hits on all math pages (this figure includes each equation and graphic as a separate hit). Posting on the Internet has also proved useful as a source of reader feedback, including notification of a number of typos. I am interested in maintaining a web site for the encyclopedia, but also in publishing a companion CD to the printed version."

19.   I became frustrated as the time passed without the manuscript being published. In addition to speaking to other publishers myself, I sought the assistance of a literary agent in hopes of expediting the process. I received an inquiry from an agent named Susan Ann Protter. I forwarded her a proposal on February 23, 1997. It outlined my vision for the future of the book and the website, including the following: "I believe that continuing to maintain a publicly available website is useful. In fact, it may even serve as a useful marketing strategy. For instance, I have already received about 50 inquiries from people wishing to purchase a published copy."

20    However, after additional discussions with Ms. Protter, I determined she did not have sufficient technical expertise to understand the nature of my project, and so did not engage her services.

## FORMATION OF THE CRC CONTRACT

21.   Mr. Pletscher had been the individual at CRC who responded to my manuscript offer. But on March 6, 1997 Mr. Pletscher informed me that due to a reorganization at CRC he would no longer be responsible for math titles. He told me I should contact Robert Stern ("Mr. Stern")—who would, Mr. Pletscher said, "[P]ick up where I left off." I contacted Mr. Stern, and we spoke briefly about my website, the readying of the manuscript for publication, and my ideas for a CD-ROM version of the manuscript. There was no negotiation of contract terms, nor did Mr. Stern tell me at that time what terms the contract would contain.

22.   On April 4, 1997. I received a letter from Mr. Stern containing an author agreement which he described as "very straight forward [sic] and easily understood." I took this to mean that CRC had agreed in substance with the discussions I'd had with Mr. Pletscher and my telephone discussions with Mr. Stern, including my desire to maintain a free and publicly accessible website; I read nothing in the contract which said otherwise.

23.   After receiving the contract from CRC, I had a number of discussions with Mr. Stern. I said that because of the great popularity of the website, about which we had spoken on multiple occasions, I believed that the book would sell very well. At that time, I believed that CRC would be able to sell a minimum of 3000 books at around $60 apiece. However, I thought there was a good chance that sales could be higher, so I suggested a

sliding royalty scale whereby I would receive a low rate if the book was not successful, but a high rate if it was. Mr. Stern told me no such modification to CRC's flat offer of 10% was possible. He said the contract was standard, and in effect that I should take it or leave it.

24.    I told Mr. Stern that I planned to continue developing my website, from which the book was derived. I also told him that the already large following of *Eric's Treasure Troves of Math* provided a valuable tool for promotion of print and potential CD-ROM versions, as well as a platform on which to develop potential future editions. Mr. Stern said that CRC would have no problem with this and looked forward to the free publicity it would provide. He also said that other CRC books were associated with web sites which were available to the public, and cited a CRC publication entitled *The Handbook of Applied Cryptography* as an example of this model.

25.    After reading the author agreement and being told that all the language and terms were standard in the publishing business, I signed it. CRC defined the term "Work" in detail, which confirmed what I believed I was assigning to CRC: *"approximately 1400 camera-ready manuscript pages and includ[ing] approximately 1200 camera-ready illustrations to yield a completed work of approximately 1408 printed pages[.]"* I understood this to mean that I was assigning to CRC the right to publish the text I had offered them. I also read the portion of the contract which stated that CRC would own all of the rights to the Work, and I believed (and still believe) that this meant CRC could exercise those rights with respect the thing I had offered them—the manuscript. I never had any thought about ownership of the website being assigned to CRC, and Bob Stern never told me that was part of the assignment.

26.    The single substantive point upon which Mr. Stern would permit negotiation was on the royalty rate for "derivative works," which I felt should be much higher than the 5% they had offered me. Stern initially said he could not negotiate this, but later said he could allow the royalty to go up to 10%. The original contract I received did not contain this change; Mr. Stern told me to go ahead and sign the incorrect original and return it. He would substitute a corrected page and send it to me. The versions of the agreement signed by me and CRC were therefore not the same ones, and I was never asked to countersign the modified page. In addition, when I received the countersigned agreement containing the inserted page, its pagination did not fit the preceding and following pages—resulting in much redundant and nonsensical text in the agreement. Even though CRC gave me no option but to use their boilerplate contract, the resulting document was still bungled.

27.    I returned the author agreement to Mr. Stern on April 15, 1997. At no time up to this point had Mr. Stern told me that I would have to take my website down or impair its operation in any way. I believed I had made it clear to Mr. Pletscher that I wished the website to remain in its present form after the book was published, and I believed—based on Mr. Pletscher's last email to me and the clear wording of the contract defining "the Work" only as the manuscript—that he had conveyed this fact to Mr. Stern and Stern understood. Had I believed that I would be obligated to remove my website or impair its operation as a condition of my contract, or believed that I was assigning to CRC any rights to my website, I would never have agreed to sign their contract.

28. On May 9, 1997, Mr. Stern visited Charlottesville and the two of us spoke at length. We discussed my book, the possibility of creating an interactive CD-ROM version using software such as WRI's *Mathematica*, and my website.

29. During our meeting in my Astronomy Department office, I showed Mr. Stern my *Treasure Troves* website and provided him with printouts showing how it was structured and how it could be used to promote the book. I also told Mr. Stern that I wanted the website to remain freely available, as it had always been.

30. CRC's own electronic marketing capabilities appeared to be very primitive, and Mr. Stern seemed enthusiastic about my using my successful website to help promote the book adaptation. Mr. Stern also seemed concerned that people might be able to download the entire website, thus undercutting sales of the book adaptation. I assured him this would not be the case. For one thing, I told him, excessive traffic to my website adversely affected the performance of the Astronomy Department's webserver; I was in charge of that server computer for the department, and I therefore needed to keep a close watch on it to avoid inconvenience to my colleagues. Accordingly, I actively prevented bulk downloads and other potential abuses with both personal monitoring of user logs and with software that checked for suspicious activity.

31. Mr. Stern and I discussed CRC's plans for marketing the book. Mr. Stern informed me that most of CRC's sales were generated by direct mail. i.e., the sending of fliers through U.S. mail to potential buyers. What Mr. Stern did *not* tell me was that the contract entitled me to only half the normal royalty rate on this type of sale—what CRC termed in the contract "direct response sales." Mr. Stern never told me that "direct mail" and "direct response sales" were the same thing. I did not discover this fact until I received my first royalty check in February 1999.

32. We discussed the price that CRC should charge for my book, and agreed that it should be kept as low as possible in order to appeal to as broad an audience as possible, and especially students.

33. At some point during this conversation, Mr. Stern mentioned that he thought it might be a good idea to eliminate or substantially impair the functionality of the website once the book was published. This was the first time that CRC had suggested that I take down the site, and it came nearly a month after I had signed CRC's contract. Mr. Stern's view was that hobbling the website would ensure greater initial sales of the book; he never suggested that there was any basis in the contract or in copyright law for his request. I disagreed, especially since I had by that time received more than 600 requests to buy the book *via the website.* I told Mr. Stern about this and about the positive publicity that the site was already generating, and he appeared satisfied. We did not discuss the website further that day.

34. On May 11, 1997, following his return to Florida, Mr. Stern sent me a letter in which he said, in relevant part, *"As discussed you should leave the web sites alone until your book is almost published as it [sic] will provide lots of free advertising which can only bring us lots of sales."* I was pleased that he had agreed with my assessment of the site's utility for improving sales. However, his implication that parts of the website would have to be

6

removed once the book was published was clearly a change in CRC's position from the time before I signed their contract. But, since no one tried to force me to take down the site at that time, I did not respond.

## I BELIEVED THAT MY WEBSITE WAS NOT COVERED BY THE CRC CONTRACTS

35     My belief that my CRC contracts did not cover the website, or at a minimum did not prohibit its continued operation, was reinforced by the wording of the contracts and repeatedly by CRC's behavior towards the site. I saw numerous examples of actions and inaction by CRC that confirmed the belief I had maintained since the earliest days of my discussions with publishers. Among these examples are those set out below:

- The introduction appearing in every copy of the hardcover ever printed contains the history of my *Treasure Troves* projects, including the following statement:

   *After some additional effort, I was able to post an HTML version of my encyclopedia to the World Wide Web... at www.astro.virginia.edu/~eww6n/math/*

   Thus, every copy of the book gives readers a specific Internet address at which they can expect to find my website. It would have made no sense to include this address in the book if it had ever been my or CRC's intention to eliminate the website, as the presence of the printed address could then only lead to reader frustration. Furthermore, although the location of my website has moved a number of times, I have always taken steps to ensure that visitors typing in the above address are automatically forwarded to the current website, which, for many months now, has been *MathWorld*.

- The CD-ROM published by CRC contains a link to the "Encyclopedia of Mathematics Home Page," given as *www.treasure-troves.com/math/*. In addition, the CD-ROM also contains a link to *Eric's Treasure Troves of Science* at *www.treasure-troves.com/*. Inclusion of these references in the CRC products confirmed my belief that *my* website, located at an Internet address that *I personally* owned, would exist for as long as people would be using the CDs—there was no other possible explanation for including these addresses.

- The email address given on every page of the CD-ROM is my own: *comments@treasure-troves.com*. There is not a single CRC mailing or e-mail address anywhere on the CD-ROM itself. Similarly, each page of the CD-ROM contains a link to both *www.treasure-troves.com/* and *www.treasure-troves.com/math/* (both of which are web addresses and sites owned by me and having nothing to do with CRC).

- The introduction page of the CD-ROM edition is titled *Concise Encyclopedia of Mathematics CD-ROM: A Treasure Trove of Mathematical Formulas, Facts, Figures, and Fun*. This title identifies the CD-ROM as an adaptation of my *Treasure Troves* website.

- In addition, each of the thousands of pages of encyclopedic material on the CD-ROM published by CRC contains the copyright statement "© 1996-9 Eric W. Weisstein,

1999-05-26." This accurately reflects my belief at the time I prepared the CD-ROM that I continued to own the copyright to the website from which these pages were adapted, and that I believed CRC agreed with me on this. CRC's claim that the appearance of this statement on the 9012 separate pages of the CD-ROM (and again on every page my website) was "erroneous" is ridiculous. They are asking the court to believe that they allowed nine thousand "erroneous" copyright statements to evade their notice.

36.   CRC had at no time indicated to me that it had plans concerning a CRC-hosted version of my website. Even if they were interested in doing this, it has always been my belief that a third contract would be needed, like those already signed for the book and CD-ROM versions.

37.   I continued to maintain and expand the website throughout 1997 and 1998, as I received additional corrections and contributions from Internet visitors. At all times I placed the same copyright statement—"© 1996–1998 Eric W. Weisstein"—on every single web page on the site, exactly as I had done since 1996. I did this to indicate that I myself continued to control and exercise copyright over my website.

38.   Throughout this pre-publication period, my website was receiving a great deal of attention. In an e-mail on July 19, 1998, I informed Mr. Stern that my website had been mentioned in one of the world's most prestigious and widely circulated scientific journals. *Science*. Mr. Stern replied, "Congratulations on the mention as "Hot pick" in Science Magazine thats [sic] quite an accomplishment."

39.   I received a phone call from Mr. Stern in late October or early November 1998, as the book adaptation of *Eric's Treasure Troves of Math* neared final production. Mr. Stern asked me to remove portions of my website now that the book was in production. I told him that I did not want to do this, and that the website had already produced a large number of pre-release sales for the book. Mr. Stern insisted that we should have some sort of access restriction in order to ensure good sales.

40.   My discussions with CRC regarding the CD-ROM project affected the way I viewed this latest discussion of my website. I was led to believe that the CD-ROM project required a contract separate from the book deal because each contract covered a specific adaptation of my website, tailored to a different medium with different technical requirements. CRC represented to me that the various contracts covered only adaptations from the paper manuscript I had originally contracted to deliver to CRC, and not the website—which I continued to believe was exclusively my own. I never believed that I was contractually obligated to follow Mr. Stern's suggestions, nor did he ever present the idea to me as anything but a marketing move. Mr. Stern always framed the issue to me in those terms. Still, I felt that accommodating the marketing advice of my publisher would be acting in the spirit of voluntary cooperation to advance our shared interest.

41.   So in November 1998, despite my better judgment, I began restricting access to portions of the site. Mr. Stern had given no guidance on how the site should be limited, so I began restricting access by randomly choosing a set of letters of the alphabet and blocking all entries starting with those letters. I wanted all the material on the site to remain

8

accessible at least part of the time, so I rotated the entries which would be blocked on a daily basis.

42     I immediately began receiving e-mail messages from irate visitors and contributors to my website. Some of the messages were very unpleasant:

•  *"As regular user of your wonderful work, I must say I'm particularily [sic] deceived by the way your site happens to evolve. I consider it was a HUGE achievement, the \*first\* real online encyclopedia, NOW IT'S JUST ANOTHER MATH BOOK !! Do CRC really expect to sell more books because the online version is now crippled?"*

•  *"Do you know how long the blocking will be in effect? Also, is there an address for peons like me to voice our feelings about CRC's decision? I looked at their page and orders@crcpress.com and bstern@crcpress.com looked like good targets."*

•  *"Subject: you mercenary queer sellout!"*

•  *"Subject: selling out: I thought we only had to put up with this b------t in the entertainment industry."*

43     In the meantime, I had also been working on a CD-ROM adaptation of my website. In November 1998, Mr. Stern informed me that a second contract would be needed in order to give CRC permission to published my CD-ROM. This was a bit of a surprise to me, since I considered the CD-ROM to be a "derivative work" of the book, and therefore assumed that it was already covered by the original contract. However, Mr. Stern said that the new contract was necessary because the book contract was "a one-time deal," that a CD-ROM was different from the book, and that electronic products were handled by a different division at CRC. Since the "work" covered by the original contract was defined to be "1400 camera-ready pages" and I understood that the new contract would encompass "textual and database material" corresponding to a CD-ROM version of the book, it was clear to me that both CRC and I understood that neither (and certainly not both) of these contracts covered my website. Moreover, the website was not mentioned in either contract, despite the fact that CRC was obviously very familiar with it by now.

44.    On December 7, 1998 Mr. Stern sent me the CD-ROM contract to sign. I was surprised to see that the new contract called for only a 5% royalty rate. I said that even a 10% royalty would be too low, since I was offering a duplication-ready master CD-ROM. Mr. Stern stated that 10% was the most CRC would give me, and no more negotiation was permitted. I reviewed the CD-ROM contract, and again was told by Mr. Stern that it was a "standard" contract in the industry. On the basis of his assurances, I signed the CD-ROM contract on December 12, 1998.

45.    In early December 1998, the first printing of the manuscript I had sold to CRC was made available. Sales of the book version were extremely strong, and the first printing sold out in a matter of months. Even as sales of the book grew, activity at my website remained high; I continued to add material to the site.

46.  I began thinking about how to remove the onerous blocking which I had reluctantly imposed earlier, and to return the website to the form in which it would reach the most people and have the highest possible Internet visibility.

47.  In a March 24, 1999 letter, I responded to a number of questions from Joe Ganzi ("Mr. Ganzi"), from the Electronic Publishing Division at CRC. In addition to answering Mr. Ganzi's queries, I also emphasized my unhappiness with the reduced access to my website, in view of the solid sales of the book.

48.  In the meantime, I had greatly improved the monitoring system I used to detect attempts to download from my website an excessive amount of material. It runs without human intervention, blocking any users who attempt to download more than approximately 10% of the site in any 24-hour period. My monitoring procedure also completely blocks from my website the use of automated programs which prowl the Internet and are known to be bulk downloaders—known as "spiders". I removed the letter-based access restrictions altogether in June 1999.

## ERIC COMES TO WRI

49.  In February 1999, I was invited by a representative of WRI to visit its Champaign headquarters and speak about my successful mathematical website. I accepted the invitation, and gave a presentation in WRI's main conference room on March 26, 1999. On the day following my presentation, I was offered a position with WRI by a representative of the company's human resources department.

50.  I discussed possible terms for my employment at WRI for some weeks. I was enthusiastic about the possibility of working for what I knew to be one of the world's premier technical software companies, and pleased to learn that the company was supportive of my long-term Internet effort to collect and disseminate free mathematical knowledge.

51.  I decided to accept the company's offer, and prepared to begin work at WRI on June 1, 1999. In the meantime, I needed to find a new host computer for my website, so in April of 1999 I purchased the *"www.treasure-troves.com"* domain name and began hosting my web pages on a commercial Internet-hosting site.

52.  During April and May, 1999, I was contacted by Allan Wylde ("Mr. Wylde"). Mr. Wylde identified himself as a former book publisher and current consultant for WRI. Mr. Wylde and I discussed my website, as well as the two contracts I had signed with CRC. Mr. Wylde informed me that he was a former colleague and personal friend of Mr. Stern.

53.  On April 30, 1999, after I had explained the current situation to Mr. Wylde, he informed me that he had spoken with Mr. Stern. Mr. Wylde told me that CRC and Mr. Stern agreed with me that the continued operation of the website had probably enhanced sales of the book adaptation.

54.  At about this time, WRI began to think about various ways to collaborate with CRC on a large number of projects having nothing to do with me.

10

55.   On May 6, 1999, Mr. Wylde said he had spoken further with Mr. Stern about CRC's electronic publishing plans, and that CRC was interested in pooling resources with WRI in order to create electronic versions of a number of CRC handbooks. I also knew that CRC was planning to ship a large number of its handbook titles for WRI to evaluate.

56.   After arriving at WRI, I discussed with my new colleagues my future plans for my website. I was very enthusiastic about adding additional features and improvements to the site, and looked forward to making these enhancements with the help of WRI resources. While these discussions were underway, I continued to maintain and update my Internet site, which I had placed at the Internet address I had purchased, *www.treasure-troves.com/math/*. It was, at all times, accessible to the public and free of charge.

## MEETING BETWEEN WRI AND CRC IN WRI'S CHAMPAIGN HEADQUARTERS

57.   A meeting took place on June 14, 1999 at WRI headquarters in Champaign, Illinois. During this meeting, WRI representatives demonstrated a number of WRI's electronic publication products to four visitors from CRC. The CRC representatives appeared to me to be favorably impressed by these demonstrations, and to be interested in potentially using them in the compilation of future CRC handbooks, as well as for adding interactive components to their "EngNetBase" website.

58.   Following closed-door discussions to which I was not a party, the four CRC representatives joined Mr. Wylde and me at a nearby restaurant. Based on the congeniality and openness of the conversation, I concluded that the earlier discussions had gone well. I learned from Mr. Wylde that a detailed proposal was to be sent by WRI to CRC, based on the discussions held at the meeting.

## CONTINUING CRC CONTACTS

59.   Sometime around late July or early August 1999, Mr. Stern telephoned me to tell me Mr. Cuddeback was going to be leaving CRC, that CRC was looking to hire people to replace him and/or work on their electronic projects, and that they were considering making me an offer. I subsequently received a call from Mr. Cuddeback, during which I told him that: (1) I was happy at my current position with WRI and had my hands full with my current web projects; (2) CRC had hitherto demonstrated itself to be rather primitive and indecisive in its electronic capabilities, and (3) as a result, any single person would find it nearly impossible to move CRC's electronic publishing plans forward.

60.   After this telephone conversation, I did not hear back from Mr. Cuddeback, nor did CRC make me an actual offer for employment. I have not had any further contact with Mr. Cuddeback.

## MATHWORLD.WOLFRAM.COM

61    At WRI, I began work to enhance my *Treasure Troves of Mathematics* website. I was very excited at the considerable interest my project generated at WRI, and attended a

number of meetings in which we discussed ways my current website could be improved. At least three other WRI employees were involved in these discussions.

62. We decided that there were two areas in which my website could be most substantially improved: the graphical design, and addition of a subject-based index. Material on my website was organized only alphabetically up to that point, and we decided that the subject-based classification should become the primary method of locating information.

63. Following these discussions, I spent the months of June through November 1999 working on the graphical design, devising a subject classification, classifying all entries on the website, and writing the software code that allowed the system to work. Several other WRI employees were involved in the project, which absorbed a great many person-hours.

64. In December of 1999, the new design was complete, and I changed the name of my site from *Eric's Treasure Trove of Mathematics* to *Eric Weisstein's World of Mathematics* ("*MathWorld*"). At the same time I moved the site to a WRI-owned computer at the Internet address *mathworld.wolfram.com*, and began redirecting visitors from *www.treasure-troves.com/math/* to *mathworld.wolfram.com*. I also replaced the copyright statement with a new one reflecting all the different portions of the site (old material, new material, and the graphical design)—"© 1996–2000 Eric W. Weisstein and WRI, Inc. Sponsored by WRI, Inc., makers of *Mathematica*."

## CRC INITIATES LEGAL ACTION

65. Although CRC had original promoted its book version of my website with some vigor, I grew increasingly disappointed over time as these efforts dwindled. Within a year of its release, the book ceased appearing in mailings sent by CRC, including special ones for its "Most Popular Math Titles." I was also greatly disappointed that CRC had raised the price of the book twice within its first year, from the original $65, to $79.95, and then to $99.95. This contradicted our original strategy of keeping the price low enough for students to be able to afford, which Mr. Stern had agreed to do.

66. I was also disappointed that CRC appeared to be taking no steps to get the book into bookstores. To the best of my knowledge, the book has never been carried in any bookstores in Champaign-Urbana, Illinois or Bloomington, Indiana (my hometown), despite the fact that both towns are the homes of large state universities with large numbers of students and researchers in need of technical handbooks.

67. In February, 2000, a number of interested buyers contacted me via *MathWorld* to ask me why the combined book/CD-ROM "bundle" had been unavailable since at least November of 1999. I was very surprised to hear this, and contacted both CRC and the Internet bookseller Amazon.com. CRC ignored my request for information, but Amazon.com explained that CRC was no longer selling the "bundle."

68. As CRC's inattention to my concerns about their total lack of marketing for the book and CD-ROM continued, I wondered if they had lost all interest in me. On February 15, 2000, I sent a note to Mr. Stern stating in relevant part:

> *"I've recently noticed a few signs which seem to indicate CRC is not doing an optimal job of publicizing the CRC Concise Encyclopedia of Math. I was hoping you could reassure me :)*
>
> *(1) I just got the CRC "Best of Math" flier. To my surprise, my encyclopedia is nowhere to be found.*
>
> *(2) amazon.com has been listing the book/CD-ROM combo as out of print and back-ordered for about 4 months now... Since it is still impossible to order it from CRC's website (despite my having sent about 5 e-mails to Karen and Joe about this last year), that means there is currently no way at all to order it on the web. Would it be possible to have someone contact amazon.com and find out why they think the combo is on backorder?*
>
> *(3) I never heard back from you about the color direct mail flier which was supposed to go out promoting the [CD-ROM—erroneously written as "book" in the original] (and on which I sent you comments last summer). Do you know if it ever went out, or did the flier just get dropped?"*

69.   Later that day, I received a phone call from Mr. Stern. I repeated my concerns to him, and he told me that (1) because the encyclopedia had been out for two years now (actually, it had been out for less than 15 months), it was not considered a very high priority and hence may have been "overlooked" when creating the brochure, (2) CRC had decided to discontinue the bundle, though he could offer no reason for this decision, and (3) promotional fliers for the CD-ROM and bundle editions had never seen the light of day.

70.   At the end of this conversation, Mr. Stern told me that he had been hearing about my website and was told that the site was now located at a WRI web address. I told him that this was indeed true. Mr. Stern said that something would have to be done about that. I told Mr. Stern that I did not understand why the shift from the old website to the *MathWorld* site should be a matter of any concern, but Mr. Stern said that it was and that he would have to inform his superiors at CRC. I did not know what to make of this, so I asked him to contact Michael Cronin ("Mr. Cronin"), an attorney at WRI who I believed would be able to clear up any questions.

71.   On March 8, 2000, I was greatly surprised when, after returning from lunch, I was informed that a sheriff's deputy was waiting for me in the lobby. I was even more surprised to when he served me with a document naming me and my employer as defendants in a Federal copyright violation lawsuit. This was the first and only communication I received from CRC since my conversation with Mr. Stern on February 15, 2000.

## ELIMINATION OF THE SITE IS UNNECESSARY, UNFAIR, AND WOULD HARM THE PUBLIC INTEREST

72   *Treasure Troves* has received national attention, and has been reviewed or featured in a number of prominent national publications. *MathWorld*, the new name for *Eric's*

*Treasure Trove of Mathematics,* is relied upon by thousands of students, educators, academic departments, and technical professionals. Students of mathematics worldwide refer to the website on a daily basis to supplement their studies, and I have received thousands of emails thanking me for the site. Removing this resource, which has become established as the Internet's premier source of mathematical information, would damage mathematical education and research worldwide.

73. It should be emphasized again that the access limits I have constructed for *MathWorld* are, in fact, more restrictive than the previous strategy I had followed at CRC's suggestion. In fact, on a number of occasions, I have received complaints from large companies complaining that all their staff have been denied access because one person in the company intentionally or inadvertently attempted to download too much of the website's content. Since I have an effective measure to protect the website against excessive downloads in place, CRC's claim, as stated in §31 that "Exhibit 11 incidentally shows that anyone can download *MathWorld*" is revealed to be totally false.

74. Clearly, CRC's claim that *MathWorld* "supplants" or poses "a formidable threat" to the book is ridiculous. Comparing Exhibit 11 of CRC's Motion to the pagination of the book version, one finds that a single page from the book corresponds to roughly 6.4 printed web pages. Even if it were technically possible to download the entire website, which it is not, replicating the 1,969 pages of book by printing out entries from the website, would require 12,600 pieces of paper. If ordinary printer paper were used, the assembled printouts would stand more than 4 feet high, and weigh in at more than 120 lbs. The cost of supplies would be $630, and at 24 pages per minute, the time required to produce this printout would be 8 and 3/4 hours. *Even if a visitor to the site were inclined to attempt this, they are prevented from doing so by fully automated controls which will not allow more than 10% of the site to be downloaded in any 24-hour period.* If they try to download 10% or more of the content in a single day, their ability to access the site *at all* is cut off.

75. CRC claims the existence of the site harms its sales of the book. I discovered for the first time in CRC's court filing that my book is the company's "best-selling mathematics title." Since CRC has done almost no meaningful promotion, and hiked the price of the book three times (more than 50%) in less than a year, I believe that my website is the most significant reason for the *success* of the book. To request the imposition of an injunction based on the claim that sales of the book have been hurt by the existence of the website is completely contrary to the facts—even as CRC states them.

76. This is doubly true with respect to the CD-ROM product. CRC has done no marketing whatsoever for the CD-ROM. Yet according to CRC's own admission, the CD-ROM has sold nearly 1,000 copies to date at an average of $50 apiece. *Since the only available place for information about the existence of the CD-ROM is via my public website, it follows that all the CD-ROM sales claimed by CRC are a direct result of that website.* It is therefore patently unreasonable to claim that the continued operation of website has damaged or will damage CD-ROM sales.

77. There is no way that a second edition can be produced without new material, and the only way in I have acquired and developed new material in the past is through the evolution of

the website. Secondly, CRC's claim that the website will result in substantial expenses associated with an accelerated schedule for the second edition is equally nonsensical. I personally did all of the work to produce camera-ready copy. In the unlikely event that I would entertain an offer from CRC to produce a second edition of the book, it is probable that I would have to do all of the work again.

78.     I do not believe that either I or WRI have in any way violated any agreement with CRC or the law. I am deeply saddened by the whole affair, especially since it is now plain to me that CRC has misled and taken advantage of me on multiple occasions during our nearly two years of association.

79.     My continued desire, as it has been since I started working as a teenager on the dream which has found its home in *MathWorld*, is to promote and spread mathematics and mathematical literacy. In order to pursue my dream, I gave up a promising career in academia, left a coveted faculty position at one of the country's finest institutions of higher education, pulled up stakes and trekked across the country to WRI. I would never have done any of that had I believed, even for a moment, that CRC could pull the plug on *Treasure Troves* whenever it felt like it.

80.     I have worked innumerable 70+ hour weeks in order to continue developing my website into the world's best mathematics resource. The site existed for years before CRC ever knew it, or I, existed. No one from CRC ever lifted a finger to help me develop the website (or, for that matter, the book or the CD-ROM), I never believed that CRC had any proprietary claim to my website, and CRC led me to believe that it had no intention of asserting any such claim. The website is, and always has been, mine and mine alone. CRC's characterization of its attitude towards my website as "tolerance" in its motion and affidavits is both grossly inaccurate and patronizing.

81.     To lose the site now would be a tragedy for me personally, but the biggest loss would be felt by the members of the user community who have come to depend on my site over the last 5-plus years. Most of all, I believe it would be a gross miscarriage of justice to allow CRC to turn my life's work into just another property to be squeezed dry and discarded, purely on the strength of predatory tactics and a willingness to mislead an unwary first-time author.

**AFFIANT SAYS NOTHING FURTHER.**

_____
Dr. Eric Weisstein

Sworn to and subscribed before me this _____ day of April 2000, by Dr. Eric Weisstein, who is personally known to me.

_____
Notary Public
State of Illinois
Commission No.:
My Commission Expires:

> "OFFICIAL SEAL"
> LANELL TOLBERT
> NOTARY PUBLIC, STATE OF ILLINOIS
> MY COMMISSION EXPIRES 6-21-2000

16

## UNITED STATES DISTRICT COURT
## SOUTHERN DISTRICT OF FLORIDA

CASE NO. 00-893-CIV-GRAHAM/TURNOFF

CRC PRESS, LLC,

       Plaintiff,

       v.

WOLFRAM RESEARCH, INC., STEPHEN
WOLFRAM and ERIC WEISSTEIN,

       Defendants.

_____/

**AFFIDAVIT OF THEODORE GRAY
IN RESPONSE TO PLAINTIFF'S
MOTION FOR PRELIMINARY
INJUNCTION**

STATE OF ILLINOIS    )
                 ) ss:
COUNTY OF CHAMPAIGN )

**BEFORE ME**, the undersigned authority, personally appeared Theodore Gray, who being duly

sworn by me, deposes and says:

1.    All statements contained in this Affidavit are true and correct:

2.    I am a member of the Executive Committee of Wolfram Research, Inc. (hereinafter "WRI"), and one of the founding members of the company. At all times relevant herein, I have been employed by WRI and have served on its Executive Committee. I offer what follows based upon my own personal knowledge where indicated. Otherwise, I offer the opinions contained herein as an expert. My expertise derives from my many years' experience as an author, on-line publisher, executive of a software company, and manager of an Internet site. In addition, some of the facts that I have relied upon herein are founded on information collected by others acting under my supervision.

## INFORMATION ABOUT WRI

3.    WRI is a creator and publisher of technical software. WRI currently employs more than two hundred individuals, primarily at its headquarters in Champaign, Illinois, near the main campus of the University of Illinois. It has affiliated companies in Europe and Asia.

4.      Approximately 90% of WRI's revenues are generated by a single product, its *Mathematica* computer software. *Mathematica*, widely regarded as one of the most sophisticated software applications ever developed, is the leading product in the field of technical software. WRI created *Mathematica* in 1987 and has continued to improve it through extensive in-house research and development efforts. *Mathematica's* base price is $1500 (its actual price can vary from this figure, depending on the particular market in which it is sold).

5.      Of *Mathematica* sales, WRI estimates that greater than 90% are to non-mathematicians—users of mathematics who do not create or explore mathematics professionally or as amateurs. Although WRI sales and product promotion are thus primarily in non-mathematics markets, WRI engages in a variety of activities that support and build good will in the world mathematics community, whose ongoing work is essential to our research and development efforts.

6.      WRI is a closely held private corporation. Most of its stockholders were trained as scientists, mathematicians, or computer scientists. This kind of ownership structure is not particularly uncommon in high-tech startup companies, but it is unusual in a company as mature as WRI.

7.      WRI is also unusual in that its shareholders have chosen to reject the attractions of taking the company public. Having the general public as stockholders would impair our ability to operate the company in the manner we have agreed upon. Moreover, the company has not needed outside financing to be able to support the projects we feel inclined to pursue.

8.      WRI has been profitable for the last twelve years. Its commercial success allows the firm to take a long view, and affords its founders and other research scientists employed by the company the ability to pursue their personal scientific research interests.

9.      A number of world leaders in particular mathematical specialties have come to work for WRI. They have done so because they find here a dynamic pool of research colleagues of extremely high caliber, and a corporate environment where their work is nurtured and appreciated and ultimately finds its way into real practical use by thousands of their colleagues around the world.

10.     Without this collegial atmosphere, we would be unable to continue to attract the talent we need to maintain *Mathematica's* leadership position.

## WRI'S PUBLIC SERVICE ACTIVITIES

11.     I have read in CRC's submissions to the Court the allegation that, by sponsoring Eric's website, WRI is seeking to enhance its own profits by increasing the traffic to our websites. I would like to respond to that false allegation.

12. WRI supports a number of ongoing projects that may or may not ever yield a financial benefit to the company. For example, we regularly sponsor activities, such as "Math Awareness Month 2000," that promote interest and excellence in mathematics.

13. WRI also sponsors and hosts the very popular Internet site www.integrals.com, which allows anyone with access to the Internet (high school and college students and teachers, for example) to compute any symbolic integral, free of charge, through a web browser. Scheduled to become available to the public later this year is another website, *www.specialfunctions.com*, that will be the world's largest and most complete reference work on the topic of special functions (an important field in mathematics). This site will also be free to the public in its entirety; its development represents four person-years of research work by top experts in the field, working at WRI on company time.

14. WRI also maintains and offers many tens of thousands of pages of technical information freely to the public, in an "online" Internet library.

15. We do not commit financial or human resources to these projects hoping to generate sales for WRI; we recognize that our product is not something most users purchase on the basis of a few satisfactory visits to a useful website. As noted below, only 0.5% of the visitors to Eric's site click over to WRI's corporate site. We engage in these public service activities because they fit into our larger vision of how we can serve the mathematics and science communities from which we individually have come and in which we remain active members. Our decision to devote WRI resources to Eric Weisstein's website was—and is—of that sort.

## HOW ERIC'S WEBSITE DIFFERS FROM HIS CRC PUBLICATIONS

16. I note that in its papers filed with the Court, CRC accuses WRI and Eric of copying CRC's book. That is entirely incorrect and I would like to explain why.

17. In my opinion it is a fundamental misunderstanding by CRC of the nature of Eric's website, and of the relationship of that website to Eric's book and the CD-ROM, that is at the heart of the instant action.

18. In my opinion, it is backwards to assert that Eric's website is an electronic form of the book and CD-ROM. Rather, those CRC publications are "snapshots" of the website's contents at one particular point in its ongoing evolution. Future editions of the book and CD-ROMs would merely be new "snapshots" of the dynamic, constantly improving, website.

19. Based my experience and that of our staff, I estimate that the cost of producing a book comparable to The Concise Encyclopedia from scratch using hired editors and contributors would be at least $100,000, quite probably many times more.

3

20.   And yet is my understanding that CRC paid no development costs whatsoever for this large, complex, work, which according to its complaint has become their best selling mathematics book. Moreover, CRC incurred minimal costs editing and proofreading the snapshot that Eric created and formatted for it from his website. (In my experience, the $4,000 paid up front to Eric would not normally be considered adequate for preparing a manuscript of even half the size.)

21.   Eric could bring to CRC a very advanced version of a large encyclopedia that already had a following **only** because he and other talented contributors had been collaborating on it for years, building an online resource that they were all actively using and improving. They expected to continue to use and improve the online resource indefinitely into the future, whether or not a version of it was "photographed" and distributed offline in snapshot form.

22.   Their "compensation" for this enormous amount of work was (and remains) primarily their ability to enjoy continued access to the thing they helped build, and secondarily their pleasure in sharing their work over the internet with hordes of others who have in common with them an interest in mathematics.

23.   A single individual like Eric—dedicated and talented as he is—could not have brought such a project to CRC in such an advanced state of development on his own. The input of his online volunteers was as essential as it was invaluable.

24.   It is my opinion that in the absence of Eric's unique online community, this project simply would not be the success that it is.

25.   Forget for the moment the entries contributed by the online community, over and above Eric's initial and ongoing work. Without the heavy and potentially enormously expensive work of editing and proofing his own contributions in minute detail, done free of charge on a volunteer basis by Eric's numerous online colleagues, there could have been no publishable book without enormous expense to the publisher.

26.   It is not an insignificant detail that quite a number of the individuals who have contributed comments, corrections, or insights to Eric's website are well-known, distinguished members of the academic community (professors at prestigious universities, etc.), and highly talented if little known amateur mathematicians.

27.   Many individuals of this caliber never agree to hire themselves out to a publishing company to edit and proofread, even if the company knew how to find them (unlikely, in the case of amateurs) and had the temerity (in the case of the more famous and distinguished) to approach them.

28.   But these people cheerfully provided their expertise for free to a website that they enjoyed and wanted to support. I believe it to be virtually certain that Eric's project with CRC would have been impossible, absent the online community that he nucleated, with which he continues to interact.

4

29.    Based on my experience both as an author and as a creator of Internet content, it is my opinion that Eric's belief that he had offered CRC only the paper manuscript was not only reasonable, but is perfectly in keeping with the express language of the contract—where "the Work" is clearly defined as a typed manuscript amounting to 1400 pages, etc. The reasonableness of Eric's belief is even more apparent when CRC's subsequent conduct is factored in. For example, in my opinion, if CRC believed that it owned the exclusive rights to every possible iteration of Eric's materials by virtue of the assignment language in the book contract, it would not have needed a separate contract for the CD-ROM version.

30.    In my opinion, CRC's continued assertion that *MathWorld* is copied from Eric's book is either intentionally misleading, or is evidence of the degree of misunderstanding that must have existed at the time the contract was signed. In either case, it is my opinion that the extensive website—which existed long before the contract was drafted by CRC—is not in any form acknowledged or referred to in that contract, and therefore cannot reasonably be included in the work covered by the contract.

31.    Some traditional publishers, including CRC, now post what amount to images of printed books at websites. But CRC knew or should have known the difference between Eric's dynamic, collaborative, evolving website—which preceded the book, made it possible, and has evolved further since its publication—and a website which merely reproduces a traditionally created and published book.

32.    In short, for CRC to assert that WRI has copied entries from the printed Encyclopedia is patently false and misleading-- as CRC is fully aware. *CRC* is the party that copied entries from the website (with Eric's permission, of course).

## HOW ERIC'S WEBSITE CAME TO WRI

33.    In its court papers CRC accuses WRI of "brazen theft". CRC's allegation is plainly at odds with the facts, and I would like to correct the record.

34.    By 1998, a number of WRI staff knew of Eric's work and liked it. WRI understood and appreciated the amount of work involved in creating his website, and recognized its huge value as the free public resource it had always been. We knew he would need significant resources to keep the website alive— any website requires a web server computer and Internet connection in order to operate; a site as large, complex, and popular as Eric's is a considerable burden.

35.    We knew that thousands of people worldwide in mathematics and educational communities had come to rely on Eric's website over the many years of its evolution, and we knew that if the site were to disappear because Eric was unable to absorb the growing costs involved, the negative impact on this global community of users would be significant.

36.   In 1999, members of the WRI staff proposed that we step in to sponsor and host Eric's website. The Executive Committee agreed and hired Eric himself as an employee whose principal job responsibility is to maintain and continue to develop his site as a free public service.

37.   We chose to take on Eric's website as a way to support an invaluable online resource; as a way to gain a valuable employee whose presence would be a benefit to our staff; and as a way to aid mathematics education, in the broadest possible sense of the term, in this country and around the world.

38.   Our willingness to defend vigorously the instant action has its roots in our dedication to free public access to educational material.

39.   Without the financial support and expert legal representation provided by WRI, Eric would be completely unable to defend himself against CRC's aggressive legal tactics. He could not match CRC's expenditures on this litigation: In all likelihood CRC has already spent more than the sum total of all royalties earned by Eric plus the $4000 it paid for the printed material in the first place; left on his own, Eric would have been forced to capitulate.

## ERIC'S WEBSITE HAS NOT PRECIPITOUSLY CHANGED
## SINCE HE CAME TO WRI

40.   Nothing Eric or WRI is doing is new; Eric has maintained a thriving, popular website before, during, and after the publication of the CRC "snapshot." Traffic has steadily grown, exposing more and more users to the site and the book and CD-ROM based on it. There has been no dramatic increase in the number of visitors to the site since it moved to a WRI-owned server computer.

41.   Nothing WRI is doing or has done represents any threat to CRC's commercial activities in marketing the book and CD-ROM derived from Eric's site. Neither Eric nor WRI has ever taken any action intentionally to harm CRC. Nor have we unintentionally harmed CRC.

42.   On the contrary, WRI's activities have been mounted in the public interest. These efforts also are providing and will continue to provide collateral assistance of significant value to CRC by creating interest in the book and CD-ROM.

43.   The website is functioning exactly as we hoped it would. People visit Eric's website for many different reasons, and people visit our website for many different reasons. But the automated "hyperlinks" from our website to Eric's account for only a statistically insignificant portion of his traffic, and vice versa—only 0.50% of *MathWorld* visitors used the hyperlink to Wolfram' Corporate site, while just 0.48% of visitors to WRI-owned sites linked to *MathWorld*.

6

44.     Both sites are popular, but they do not by and large direct significant amounts of web traffic to one another. All indications are that Eric's website continues to serve the same type of visitor now as it has since it first achieved popularity, long before Eric's association with CRC or WRL

45.     Finally, Eric's site has always contained numerous references to competitive products, including hyperlinks to sites owned or controlled by companies that compete directly with Wolfram Research. We have not asked Eric to change or remove any of these links. They are part of his site, and his site would not be complete without them. The usefulness of his site to the public is more important to us than any commercial harm we might theoretically suffer as a result of the hyperlinks to our competitors.

## WHY WOLFRAM BELIEVED SPONSORSHIP OF THE SITE WAS NOT A VIOLATION OF THE LAW OR THE CONTRACT

46.     CRC accuses WRI of acting in a "willfully" illegal manner. That is incorrect and I would like to set the record straight.

47.     Wolfram Research is a software company, and we interact with book publishers regularly. There are literally hundreds of books published about *Mathematica*, or which use *Mathematica* to construct or illustrate mathematical formulas and concepts. *Mathematica* software is licensed by a number of book publishers for inclusion in textbooks.

48.     We vigorously defend our intellectual property rights worldwide. We do not tolerate, and frequently track down and resist, piracy of our software anywhere it occurs, in the United States and throughout the world.

49.     And as with any software or other publisher, our ability to attract authors depends on our reputation within the academic community as a company that treats intellectual property with respect.

50.     Wolfram has signed contracts similar to those between Eric and CRC, both as author and as publisher. We have been involved in numerous negotiations over the wording of electronic rights clauses, particularly as they relate to use of materials on the Internet. Having had such extensive experience with copyright issues from all perspectives, we felt competent to evaluate the copyright and contract status of Eric's website.

51.     We formed an opinion that CRC's copyright did not apply to Eric's website, and that Eric had been misled by CRC in the years since he signed the contract into believing that it did give CRC some degree of control over the website. This opinion was based on several factors, including our reading of the contract, the circumstances surrounding the formation of that contract, and our own experience of the industry as publishers and authors.

7

52. We did not believe that Eric's book and CD-ROM contracts could be construed to transfer Eric's entire life's work to CRC for $4000 plus uncertain royalties unlikely to exceed a few tens of thousands of dollars. WRI believed and continues to believe that CRC knew or should have known at the time the book contract was signed that its provisions would not encumber Eric's website. On that basis, we agreed to take on the website and hired Eric to maintain it.

53. However, being experienced in business, we clearly understood that there was potential for misunderstanding on this point.

54. In particular, we realized that people might mistakenly believe that the website was an "electronic form" of Eric's book, derived from the printed work, and therefore covered by the contract.

55. Fearing this was CRC's understanding of the situation, we attempted to explain the situation to them as we viewed it, and attempted to clear up any misunderstanding. Our preference was to sign a specific agreement with CRC clarifying once and for all the status of Eric's website, though at no time did we, nor do we at present, believe that CRC's permission was required to host the website.

56. Prior to Eric's arrival as an employee of WRI, to explore the possibility of potential ventures with CRC, we held wide-ranging discussions with CRC culminating in a day-long visit by four of CRC's employees to our headquarters in Champaign, IL. We discussed various projects for publishing materials on the web using Wolfram Research software technologies. We felt there were opportunities for cooperative developments, with each side having something to offer the other. We made specific proposals for joint venture firms that could be founded to exploit these possibilities.

57. After the meeting, our contacts with CRC were minimal. We later learned the reason was that many of the participants had either left the company or been reassigned; but our interpretation at the time was that CRC had lost any interest it might have had in the joint ventures our companies discussed.

58. Based on our belief that Eric had retained the right to do what he liked with his website, and based on our belief that CRC had lost interest in pursuing other joint ventures, we proceeded to invest money and manpower in Eric's website. We wanted his site to approach the standards of functionality and usability that WRI demands, and we wanted the site's graphic design and interface to be as good as we could make them.

59. To date, we estimate that approximately $100,000[1] in company time and resources have been spent in making improvements to Eric's site, both prior to and since Eric transferred its location to one of our Internet servers.

---

[1] This amount does not include the time of senior management personnel at WRI, which if included would significantly increase the figure stated.

8

**AFFIANT SAYS NOTHING FURTHER.**

Theodore Gray

Sworn to and subscribed before me this 21st day of April 2000. by Theodore Gray, who is personally known to me .

Notary Public
State of Illinois
Commission No.:
My Commission Expires:

"OFFICIAL SEAL"
NOTARY PUBLIC STATE OF ILLINOIS
REBECCA S. PORTH
COMMISSION EXPIRES 10/21/02

8