UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF FLORIDA

CASE NO. 00-893-CIV-GRAHAM/TURNOFF

CRC PRESS, LLC,

    Plaintiff,

v.

WOLFRAM RESEARCH, INC., STEPHEN
WOLFRAM and ERIC WEISSTEIN,

    Defendants.

_____/

## REPLY MEMORANDUM IN FURTHER SUPPORT
## OF MOTION FOR A PRELIMINARY INJUNCTION

    CRC Press is asking this Court to do what thousands of courts have done before: enforce a bill of sale.

    CRC Press bought, and Dr. Weisstein sold, the copyright in the Encyclopedia. Wolfram Research's story that all CRC Press bought was really book publication rights is belied by the simple, unambiguous terms of both Agreements at issue here: "The Author hereby expressly grants, transfers, and assigns to the Publisher full and exclusive rights to the Work, including, without limitation, the copyright in the Work, all revisions thereof, and the right to prepare translations and other derivative works based upon the Work.... The Publisher's exclusive rights include, without limitation, the right to reproduce, publish, sell, and distribute copies of the Work ... and other derivative Works based upon the Work, in print, audio-visual, electronic, or by any and all media now or hereafter known or devised ..." (emphases added)

    Defendants' characterization of the Encyclopedia as merely a "derivative work" of the Weisstein website is simply false and is belied by numerous admissions in defendants' own papers that there was one and only one work existing when CRC Press bought the copyright in it. The content of Dr. Weisstein's website and of the Encyclopedia was identical: one was a "snapshot" or "copy" of the other, in defendants' own words. Indeed, Dr. Weisstein told CRC Press that the website was "an HTML version of the manuscript" for the Encyclopedia.

249006

Moreover, even had the Encyclopedia been a derivative work, rather than the same work as the website, Dr. Weisstein still sold all possible "exclusive" rights, in the language set forth above, in the content making up that work to CRC Press.

Wolfram Research here poses as almost a not-for-profit company vindicating the supposed rights of a naïve academic, but this is a case of a wolf in sheep's clothing.  What is really going on here is an attempt by a big, successful, commercial company to steal the intellectual property of a publisher.  The Court should not be fooled.

## ARGUMENT

I      CRC PRESS IS LIKELY TO SUCCEED ON THE MERITS

A.      CRC Press Owns Exclusive Rights In The Text And Illustrations Of The Work

Wolfram Research claims that its creation and distribution of MathWorld does not constitute copyright infringement because Dr. Weisstein supposedly did not transfer the copyright in the Encyclopedia to CRC Press, and merely authorized its publication in book form. Defendants' contentions are flatly contrary to the unambiguous language of the Agreements and the most basic principles of copyright law.

As conceded by defendants, Florida law requires the Court to construe the Agreements according to their plain language.  Opp. Br., p. 13.  The Agreements state clearly and unmistakably in the language quoted above that Dr. Weisstein transferred to CRC Press all right, title and interest in the "Work" that was published as the Encyclopedia.  The transfer of copyright in the Work could not have been more complete or emphatic.  The suggestion that the transfer was limited to the right to book publication is utterly irreconcilable with the language granting "exclusive" rights to "publish" "in print, audio-visual, electronic, or by any and all media."

Defendants simply ignore this language, which defines the media in which CRC Press enjoys exclusive rights.  Instead, they try to re-define the content that CRC Press bought. This leads quickly to absurdity.

Defendants assert that the Agreements defined the "Work" to be merely a physical manuscript and by implication, not the text and illustrations included therein.  See Opp. Br., p. 11.  If, however, the Work included not just the blank pieces of paper on which the

2

Encyclopedia was written but the words and illustrations as well, defendants' argument collapses.

Defendants' pieces-of-paper argument is flatly contrary to the unambiguous language of the Agreements. Paragraph 1(a) of the April 7, 1997 Agreement defines the "Work" as "textual material (hereinafter called the 'Manuscript')," "artwork and photographs" and "the subject index." Thus, the Work was not pieces of paper, but text and illustrations. Paragraph 1(b) reaffirms that "The Work shall consist of approximately 1400 camera-ready manuscript pages and include ... illustrations." (emphases added)  The Work sold to CRC Press plainly included Dr. Weisstein's words and illustrations.

As a matter of common sense, CRC Press obtained the "exclusive" rights – the copyright – in something that it could publish. It could not publish blank pages. CRC Press could only publish the words and illustrations that made up the Work, and this is what it bought the "exclusive" rights to.

This result is required, not only by the Agreements and by common sense, but also by copyright law.

Copyright is provided for "original works of authorship fixed in any tangible medium." 17 U.S.C. §102(a). Weisstein's "work of authorship," therefore, was not the medium on or in which he put his words and illustrations – pieces of papers, computer memory for his website, or in the CD-ROMs or floppy discs he delivered for the CD-ROM version of the Encyclopedia. "As used in the Copyright Act, a 'literary work' is a work of authorship, but a 'book' is not. A "book" is merely a material object that may embody, and hence constitute, a copy of a given literary work." 1 M. Nimmer, The Law of Copyright §2.03[C], at 33 (1999). See also United States v. Goss, 803 F.2d 638, 642 (11th Cir. 1986) (explaining that "work" and "copy" have distinct meanings, and that "a copy is the material object in which a work is fixed.") The only things that Dr. Weisstein owned a copyright in were his words and illustrations, and he sold his copyright in them to CRC Press by the express and unambiguous language of the Agreements. When he gave CRC Press "exclusive" rights in the Work in "any and all media," he reserved no rights to himself, and had none left to sell to Wolfram Research.

The Encyclopedia Is Not A Derivative Work – It Is
The Same Work As The Work On The Web Site

Because Dr. Weisstein sold the copyright in the content of the Encyclopedia to CRC Press, as noted above, it does not matter whether the Encyclopedia was a derivative work of the content on the website or not. However, it was not, as a matter of law. There was only one copyrightable work existing, which Dr. Weisstein sold to CRC Press.

A "derivative work" is defined as "a work based upon one or more preexisting works." 17 U.S.C. §101. A derivative work differs from a mere copy of a preexisting work in that a copy does not add any copyrightable authorship to the work copied, whereas, to be a derivative work, the new work must contain new copyrightable authorship. As the Eleventh Circuit has put it, a derivative work must "contain some substantial, and not merely trivial, originality." Sherry Mfg. Co., Inc. v. Towel King of Florida, Inc., 753 F.2d 1565, 1568 (11th Cir. 1985) (citations omitted). In Sherry, the Court reversed a judgment of infringement, holding that the plaintiff's picture, which was allegedly a derivative work of an earlier picture, did not contain enough original authorship to rise to the level of a new and separately copyrightable work.

In the present case, there was no new authorship added between Dr. Weisstein's website and the Encyclopedia. Dr. Weisstein told CRC Press, before this litigation changed his story, that the website itself was "an HTML version of the manuscript."[1] Stern reply aff., ¶ 3, Exh. 5. Defendants themselves repeatedly say that the book is a "copy" or "snapshot" of Weisstein's website. Opp. Br., pp. 12, 13, 18; Weisstein aff., ¶¶ 14, 19; Gray aff., ¶¶ 18, 32. Defendants also repeatedly refer to the website content itself as the "encyclopedia." Opp. Br., pp. 1-4 and passim thereafter; Weisstein aff., ¶¶ 10, 14; Stern reply aff., Exhs. 3, 4, 5, 6, 7. Defendants characterize even their version of the Encyclopedia (MathWorld) as Weisstein's encyclopedia "renamed." Opp. Br., p. 1.

Merely copying a copyrightable work from one medium to another does not create a derivative work. In L. Baitlin & Son, Inc. v. Snyder, 536 F.2d 486, 492 (2d Cir. 1976) (en banc), cert. denied, 429 U.S. 857 (1976), the Second Circuit held that making a copy in plastic of a cast iron coin bank did not create a derivative work, despite minor changes in dimensions and form. See also Durham Indus., Inc. v. Tomy Corp., 630 F.2d 905, 910 (2d Cir.

---

[1] HTML refers to the computer language in which internet material is written. It stands for "hypertext markup language."

4

1980) (holding that plastic sculptures (toys) of pre-existing two-dimensional Disney characters were not derivative works); Gracen v. Bradford Exch., 1982 Copyright Dec. (CCH) 25, 430 (N.D. Ill. 1980), aff'd, 698 F.2d 300, 305 (7th Cir. 1983) (a painting made by superimposing one photograph over another did not have sufficient originality to constitute a derivative work). "[T]he mere reproduction of a work of art in a different medium should not constitute the required originality for the reason that no one can claim to have independently evolved any particular medium." Baitlin at 491 (citing 1 M. Nimmer, The Law of Copyright § 10, at 32 (1975)). Moving the content of the website to the Encyclopedia, therefore, did not create a derivative work. The mere downloading, reformatting (if any) or printing out of the content of the website in order to print that content in a book lacks copyrightable authorship, and therefore created only a copy and not a derivative work.

Even if the Encyclopedia were a derivative work of the website, defendants would be no better off. No matter how many previous works Dr. Weisstein might have created using the text and illustrations in the Encyclopedia, he conveyed to CRC Press "exclusive" rights to "publish, sell and distribute" that text and those illustrations in "all media now or hereafter known or devised." Agreement, ¶¶ 1, 5. "Exclusive" means no one else thereafter, other than CRC Press, can have any rights to publish or distribute that text and those illustrations. Otherwise, the word "exclusive" would mean nothing. See Dodd, Mead & Co., Inc. v. Lilienthal, 514 F. Supp. 105, 106-108 (S.D.N.Y. 1981) (publisher who had been granted exclusive rights by author to print, publish, and sell book entitled to an injunction and damages for author's infringement by publishing his own copies of book); see also, Althin CD Medical, Inc. v. West Suburban Kidney Center, S.C., 874 F. Supp. 837, 843 (N.D. Ill. 1995) (holding that grantee of rights did not have "exclusive" right to distribute software because grantor had reserved the right to determine who to sue for copyright infringement). In none of defendants' cases was a party who had granted "exclusive" rights to another allowed to continue to use the work in which the "exclusive" rights were conveyed. If Dr. Weisstein had created 1 or 100 preexisting works using the text and illustrations he sold to CRC Press, once he sold that content he had no right to keep using it, much less sell it to Wolfram Research.

B.    The Parol Evidence Presented By Defendants May Not Be Considered

As acknowledged by defendants, the Agreement is unambiguous. Opp. Br., p. 13, n. 9. Accordingly, the parol evidence rule prohibits the use of verbal agreements or other extrinsic evidence to vary its terms.[2]

Nevertheless, most of both defendants' brief and the Weisstein and Gray affidavits constitute and focus on parol evidence designed to influence the Court's construction of the Agreements – Weisstein's personal relationship with his encyclopedias, his alleged pre-contract discussions with employees of CRC Press,[3] and Gray's alleged custom in the industry. In light of the parties' agreement that the Agreements are unambiguous, however, such parol evidence is inadmissible and may not be considered. Accordingly, the Court should restrict itself to the four corners of the Agreements in considering CRC Press's claims and its likelihood of success on the merits. In re Estate of Barry, 689 So.2d 1186 (Fla. 4th DCA 1997) ("Where the terms of an agreement, as here, are unambiguous, its meaning and intent of maker are discerned solely from the face of the document").[4]

---

[2]    Monumental Life Ins. Co. v. Commonwealth Land Title Ins. Co., 435 So. 2d 975 (Fla. 3d DCA 1983) ("Any oral understanding or negotiations prior to the execution of a written agreement are merged in the written agreement."); Financial Fed. Sav. & Loan Ass'n. v. Continental Enters., Inc., 338 So. 2d 907, 908 (Fla. 3d DCA 1976) ("Representations and negotiations which precede and accompany the making of a contract are presumed to have merged in the written contract."); see also Bird Lakes Dev. Corp. v. Meruelo, 626 So. 2d 234 (Fla. 3d DCA 1993) (noting that, under the parol evidence rule, evidence of a prior or contemporaneous oral agreement is inadmissible to vary or contradict the unambiguous language of a valid contract), rev. denied, 637 So. 2d 233 (Fla. 1994); First Union Discount Brokerage Servs., Inc. v. Milos, 744 F. Supp. 1145 (S.D. Fla. 1990) (same), aff'd, 997 F.2d 835 (11th Cir. 1993).

[3]    To keep the record straight, we are submitting the reply affidavits of Robert Stern and Ronald Powers, so that the Court is not left to believe that Dr. Weisstein's account is complete or accurate.

[4]    The defendants' offer of testimony about the negotiation of the Agreement should also be disregarded because of the integration clause in the Agreement. Paragraph 16(a) of the Agreement states, "This Agreement is the entire agreement between the parties relating to the Work. It supersedes all previous oral or written representations or agreements relating to the Work and may not be modified or amended, nor may any of its terms or provisions be waived, except by a written instrument executed by the party affected by such modification, amendment, or waiver." Thus, defendants cannot rely upon any alleged representation or agreement before or after the Agreement to modify its unambiguous terms. In re St. George Island, Ltd., 137 B.R. 857, 861 (N.D. Fla. Bankr.

Furthermore, even if the Court were to conclude that the Agreement was ambiguous and that it was appropriate to consider parol evidence, defendants have failed to present any basis for interpreting the Agreement to reserve internet rights to Dr. Weisstein. The best evidence - an email Dr. Weisstein himself wrote (before he was hired by Wolfram Research) - is squarely to the contrary. When visitors to his partially blocked web version of the Encyclopedia asked about a complete web version, he did not restore it. Instead, he wrote to CRC Press as follows:

> Is there any mechanism for <u>CRC</u> to license the full version (for a fee)? (emphasis added)

Stern moving aff., ¶ 13, Exh. 5. Defendants cannot explain away this email.

At best, Dr. Weisstein's affidavit presents facts showing that he told CRC Press of his "hope" to continue presenting his work on the internet after the publication of the Encyclopedia. It is nowhere claimed that CRC Press agreed that he had a <u>right</u> to maintain his website, and it did not do so. Stern reply aff., ¶ 6. Most important, all of the documents on the subject show that CRC Press did not agree that Weisstein could maintain the whole Encyclopedia on the internet and that Weisstein knew it and behaved accordingly (until he started drawing his salary from Wolfram Research). <u>See</u> Stern moving aff., Exhs. 4 and 5.

The closest Weisstein actually comes to alleging an express agreement by CRC Press that he could keep the Encyclopedia on the internet after its publication is to say that Robert Stern of CRC wrote him, at the time the April 7, 1997 Agreement was sent to him that the proposed agreement was "very straight forward and easily understood." Weisstein aff., ¶ 22. It is impossible to believe that Dr. Weisstein, who was the valedictorian of his high school class, a Phi Beta Kappa graduate from Cornell in physics in three years, and the holder of a Ph.D. from Caltech, understand those words to mean that CRC Press was specifically acceding to all of his previously expressed wishes about his website, especially in light of the aforesaid unambiguous integration clause in the Agreement.

The parties' understanding of Dr. Weisstein's lack of rights to keep the Encyclopedia on the website after publication is apparent from CRC Press's and Weisstein's conduct. Weisstein admits that he restricted access to the Encyclopedia on-line when Mr. Stern

---

1991) ("This integration clause, along with the parol evidence rule, prevents us from looking to any extrinsic evidence to vary the express terms of the contract.")

7

of CRC Press asked him to do so. Weisstein aff., ¶ 41. In addition, he admits receiving, without objection, correspondence from CRC Press reflecting CRC Press's belief that they could direct the removal of portions of the Encyclopedia that were posted on-line. Weisstein aff., ¶ 34. If Weisstein truly believed that he was entitled to do as he wished with his work on line, why didn't he ever say so?

Moreover, if Dr. Weisstein believed that he continued to own and control the internet rights to his work, the June, 1999, discussions between Wolfram Research, for whom he worked, and CRC Press for the right to put the Encyclopedia on-line make absolutely no sense. Wolfram Research already had already interviewed, hired and employed Weisstein for 2 weeks when it had its meeting with CRC Press seeking a license to put the Encyclopedia on the internet. Wolfram Research also had access to the Agreements, so it knew who had the internet rights to the Encyclopedia. See Gray aff., ¶¶ 50-52. Why was acquiring those rights from CRC Press Wolfram Research's "top priority," if CRC Press had no rights? See Stern moving aff., Exh. 7.

It is evident that all parties understood then and now that CRC Press owned and owns the internet rights to the text and illustrations of the Encyclopedia. It was only after CRC Press requested financial consideration for putting the Encyclopedia on-line that Wolfram Research decided to put the Encyclopedia on-line without CRC Press's permission, and, later, concocted the arguments it has offered the Court.

II     CRC PRESS WILL CONTINUE TO SUFFER IRREPARABLE
       HARM IF A PRELIMINARY INJUNCTION IS NOT GRANTED

In opposition, defendants do not deny that irreparable injury is presumed in actions where plaintiff is likely to succeed on a claim of copyright infringement. They argue only that there is no likelihood of success. Thus, it is undisputed that if the Court determines that CRC Press is likely to succeed on its claim, irreparable harm is presumed.

III    DEFENDANTS WILL SUFFER NO HARM
       FROM A PRELIMINARY INJUNCTION

Since Wolfram Research sanctimoniously avers that it posts MathWorld on line solely as a public service, it cannot claim to suffer any harm to itself from the issuance of a preliminary injunction. See Gray aff., ¶ 15 ("We do not commit financial or human resources to these projects hoping to generate sales for WRI ...").

8

Similarly, no harm will befall Dr. Weisstein. The fact that he took a job with Wolfram Research where his "principal" (but evidently not "sole") duty (Gray aff., ¶ 36) is to work on the Encyclopedia,[5] will injure him only if Wolfram Research fires him. That is up to Wolfram Research, not this Court. Dr. Weisstein is already working on other projects for Wolfram Research. Stern reply aff., ¶ 12. Additionally, as noted in our moving brief, no party can claim a right to continue to infringe copyright in order to avert injury.

Dr. Weisstein allegedly fears a loss of his royalties from sales of the Encyclopedia if MathWorld is taken off the Wolfram Research site. But CRC Press judges that it would have the contrary effect, and the Agreements reserve to CRC Press the right to make that judgment; CRC Press has "the sole right to determine ... the manner in which [the Work] will be promoted, advertised and marketed." Agreement ¶ 4.

## IV    THE INJUNCTION WILL SERVE THE PUBLIC INTEREST

As noted in our moving papers, the public will suffer no injury from a preliminary injunction because the Encyclopedia will continue to be available without interruption, from CRC Press. There is no public interest in an infringer distributing for free a copyrighted work that its publisher is offering for sale, and Wolfram Research, which "vigorously defend[s] our intellectual property rights worldwide," knows that. See Gray aff., ¶ 48.

## CONCLUSION

The preliminary injunction should be granted.

ADORNO & ZEDER, P.A.

Mitchell R. Bloomberg
Florida Bar No. 197289
Ellen M. Leibovitch
Florida Bar No. 656933
2601 South Bayshore Drive, Suite 1600
Miami, Florida 33133
Tel: (305) 858-5555
Fax: (305) 858-4777

---

[5]    Ironically, although Wolfram Research knew about Dr. Weisstein and his encyclopedia long before it hired him, it did not even talk about hiring him until CRC Press had made him a published author. Weisstein aff., ¶¶ 49-51; Gray aff., ¶ 34.

249006
06017.105

Of Counsel:

David Rabinowitz, Esq.
Philippe Zimmerman, Esq.
Noeleen G. Walder, Esq.
MOSES & SINGER LLP
1301 Avenue of the Americas
New York, New York 10019
(212) 554-7800

Attorneys for Plaintiff, CRC Press, LLC

## CERTIFICATE OF SERVICE

I HEREBY CERTIFY that a true and correct copy of the foregoing Reply

Memorandum in Further Support of Motion for a Preliminary Injunction and attached Table of

Contents was served by mail on this 1 day of May, 2000 upon:

Janet T. Munn, Esq.
Steel Hector & Davis LLP
200 South Biscayne Blvd., Suite 4000
Miami, Florida 33131

and

Bradford P. Lyerla
Ryndak & Lyerla
30 North LaSalle Street, Suite 2630
Chicago, Illinois 60602

_____
Mitchell R. Bloomberg

## TABLE OF CONTENTS

Page

I CRC PRESS IS LIKELY TO SUCCEED ON THE MERITS ........................................... 2

  A. CRC Press Owns Exclusive Rights In The
    Text And Illustrations Of The Work ................................................................... 2

    The Encyclopedia Is Not A Derivative Work – It Is
    The Same Work As The Work On The Web Site ........................................... 4

  B. The Parol Evidence Presented By Defendants
    May Not Be Considered ....................................................................................... 6

II CRC PRESS WILL CONTINUE TO SUFFER IRREPARABLE
  HARM IF A PRELIMINARY INJUNCTION IS NOT GRANTED ................................. 8

III DEFENDANTS WILL SUFFER NO HARM
  FROM A PRELIMINARY INJUNCTION ........................................................................ 8

IV THE INJUNCTION WILL SERVE THE PUBLIC INTEREST ....................................... 9